UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


----------------------------------------------------------------X        Civil Action: _____
                                                                :
[UNDER SEAL],                                                   :        FILED UNDER SEAL PURSUANT
                                                                :        TO 31 U.S.C.
                            Relator,                            :        § 3730 (b)(2)
                                                                :
               v.                                               :        COMPLAINT FOR VIOLATIONS OF
                                                                :        FEDERAL FALSE CLAIMS ACT
[UNDER SEAL],                                                   :
                                                                :        JURY TRIAL DEMANDED
                            Defendants.                         :
                                                                :
----------------------------------------------------------------X

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                              :

| | |
|---|---|
| | Civil Action: _____ |
| | |
| UNITED STATES OF AMERICA, *ex rel*, YNKDY-2, | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (b)(2) |
| | |
| STATE OF NEW YORK, ex rel, YNKDY-2, | COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT |
| | |
| STATE OF NEW JERSEY, *ex rel* YNKDY-2, | JURY TRIAL DEMANDED |
| | |
| Relator, | |
| v. | |
| | |
| Shiel Medical Laboratory;  Shiel Holdings, LLC Fresenius Medical Care; BIM Medical, Inc.; Jack Basch; Does 1-10, Inclusive, et al., | |
| | |
| Defendants. | |

-------------------------------------------------------------X

1.      Relator brings this action against defendants pursuant to the False Claims Act 31

U.S.C. §3729 et. seq.  ("FCA") seeking treble damages and civil penalties.

2.      Shiel Medical Laboratory was founded in 1962 and was purchased by Jack Basch,

Michael Inzlicht, and Arthur Meisels in 1994.  It's gross receivables and net revenue grew

rapidly, to the point where the laboratory business was purchased by Fresenius Medical Care of

North America (hereafter, "Fresenius") in 2013 for nearly quarter of a billion dollars.  In

November of 2013 Shiel became BIM Medical, Inc.  It's President Chief Executive Officer is

Jack Basch.

3.      Shiel performs laboratory testing which, when used appropriately, informs physicians and other health care providers of chemical and biochemical changes in a patient's body.  When properly used this information can be useful to the diagnosis and treatment of disease.

4.      Since at least 1996, Shiel has knowingly submitted hundreds of millions of dollars in false claims to the Medicare and New York and New Jersey Medicaid programs for tests that were not reasonable and necessary or that were furnished pursuant to prohibited referrals that resulted from Shiel's improper financial relationships with physicians and with skilled nursing facilities, in violation of the physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law"), and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

5.      As Defendants knew, Medicare only covers tests that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury, based on his or her medical condition. 42 U.S.C. § 1395y(a)(1)(A). The need for each test for each patient must be individually assessed and documented in the patient's medical chart. 42 C.F.R. §§ 410.32(a), (d)(2).  Defendants nonetheless sought to, and did, cause many physicians to routinely order extensive and expensive laboratory tests merely to make more money.

6.      Shiel also paid illegal kickbacks to physicians and nursing homes in the free advertising, computer and hardware purchases to facilitate the shift to electronic medical records, gifts, parties, and expensive meals.

**I.    JURISDICTION, VENUE, PARTIES**

7.      This action arises under the FCA, as amended, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact and unjust enrichment. This Court has

jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

8.      Venue is proper in this Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

9.      This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) and because Defendant resides and transacts business in this District.

10.     Relator is a California corporation whose principal held a senior position within Shiel and who has direct and personal knowledge of the matters alleged herein.  Before this suit was filed, Relator's principal and agent (Relator's Principal / Agent and Relator are collectively and individually referred to as "Relator") voluntarily and on his own initiative contacted federal law enforcement and submitted evidence of defendants' wrongdoing.

11.     Defendant Shiel Medical Laboratory was a private corporation incorporated in the State of New York in with its principal place of business in Brooklyn, New York.

12.     Defendant BIM Medical, Inc., is another private corporation incorporated in the State of New York with its principal place of business in Brooklyn, New York.  It was owned by Jack Basch, Michael Inzlicht, and Arthur Meisels, the same partners who owned and sold Shiel Medical Laboratories.

13.     Defendant Fresenius Medical Care is a  publicly traded corporation incorporated in Germany with its principal place of business in Bad Homburg, Germany.  Its principal headquarters in the United States is in Waltham, Massachusetts, from which it conducts a nationwide health care business which last year generated $15.8 billion in revenue.

14.     Defendant Shiel Holdings, LLC is a private corporation incorporated in the State of Delaware with its principal place of business in Waltham, Massachusetts.

15.     Defendant Jack Basch is an individual residing within the Eastern District of New York.

16.     Each and every one of the fictitiously named Doe Defendants is an individual or corporation which has submitted or caused the submission of false claims, acting in concert with one or more of the other defendants.

17.     Relator is informed and believes and based thereon alleges that each and every one of the defendants has acted as the agent, director, or co-venturer of every other defendant to submit or cause the submission of false claims to the United States and to the States of New York and New Jersey.

## II.   LAW

### A.   The Federal False Claims Act

18.     The FCA provides, in pertinent part, that a person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains . . . .

31 U.S.C. § 3729(a)(1).[1]

---

[1]The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Sections 3729(a)(1) of the prior statute applies to conduct that occurred before FERA was enacted, and Section 3729(a)(1)(A) of the revised statute applies to conduct after FERA was enacted. Section 3729(a)(1)(B) is applicable to all  claims in this case by virtue of Section 4(f) of FERA.

19.     For purposes of the FCA,

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

20.     An overpayment is a payment by a federal entity to a provider or supplier in excess of what was due and payable. An overpayment may include payment for non-covered items or services including services that are not reasonable and necessary in accordance with the Medicare rules. An overpayment may be received through an innocent billing error or through a mistake of the contractor. 42 U.S.C. Section 1320a -7k(d)(1) warns that "returning the overpayment . . . is an obligation (as defined in 3729(b)(3) of title 31 for purposes of section 3729 of such title."

21.     As of May 24, 2010, the effective day of the legislation that established subsection 7k(d)(1), each day that a provider retains an overpayment, it is violating the Federal False Claims Act.

22.     A  refusal to calculate or estimate the amount of overpayment refunds owed is a separate violation of 31 U.S.C. §3729(b)(3) of the False Claims Act.

**B.** **The Medicare and Medicaid Programs**

**1.** **The Medicare Program**

23.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §

1395 *et seq*., known as the Medicare program. Entitlement to Medicare is based on age,

disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1. CMS administers

the Medicare program. At all times relevant to this complaint, CMS contracted with private

contractors, referred to as "fiscal intermediaries," "carriers," and Medicare Administrative

Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by health care

providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104. The Medicare

program consists of four parts: A, B, C, and D. Defendants billed Medicare under Part B, which

covers certain medical services, such as clinical laboratory test services, furnished by physicians

and other providers and suppliers. 42 U.S.C. § 1395k(a)(2)(B).

24.     To continue to participate in the Medicare program as an enrollee, clinical

laboratories, such as Shiel were required to submit a Medicare Enrollment Application.

Laboratories also complete Form CMS-855B to change information or to reactivate, revalidate

and/or terminate Medicare enrollment.

25.     Medicare regulations require providers and suppliers to certify that they meet, and

will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. §

424.516(a)(1)

26.     An authorized official must sign the "Certification Section" in Section 15 of Form

CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and

program instructions of the Medicare program."

27.     Relator is informed and believes and based thereon alleges that authorized officials for Shiel Medical Laboratory and later Fresenius signed the certification statement in Section 15 of Form CMS-855B, indicating that they understood that the laboratory was required to comply with Medicare laws, regulations, and program instructions, which include, but are not limited to, the Stark Law and the Anti-Kickback Statute.

28.     The National Provider Identifier ("NPI") is a standard and unique health identifier for health care providers.  All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

29.     To obtain Medicare and Medicaid reimbursement for certain outpatient items or and services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS1500") or its electronic equivalent known as the 837P form. The information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."

30.     Beginning in 1996, laboratories submitting bills to Medicare were required to ensure that the ordering physician had identified the specific medical condition which justified the laboratory test or tests.  The medical condition was to be described using the International Classification of Diseases, Edition 9 (ICD-9), which coded different disease states[2].  The ICD-9 code used to justify the laboratory test must be kept on file by the clinical laboratory.

---

[2]Beginning October1, 2015, CMS required that the new, ICD-10 codes be used instead.

7

31.     Medicare requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and unique physician identification number for the referring physician. 42 U.S.C. § 1395l(q)(1).

32.     From 2007 to the present,  National Government Services (NGS) has been responsible for processing Medicare Part B claims in New York. As Defendants performed all of its tests at facilities in New York, it submitted all claims to NGS.

### III.     LOCAL COVERAGE DETERMINATIONS (LCDs)

33.     The U.S. Department of Health and Human Services (HHS) and the Centers for Medicare and Medicaid Services (CMS) promulgate federal regulations and National Coverage Determinations (NCDs) upon which Medicare Fiscal Intermediaries/carriers rely to make coverage determinations for claims for medical services and items provided to beneficiaries. HHS adopts NCDs to exclude certain items and services from coverage on a national level that are not reasonable and necessary under HHS's interpretation of the Medicare Act. Federal regulations and NCDs are binding on all MACs nationwide. (42 U.S.C. 1395ff(f)(1)(B).

34.     In the absence of a NCD, Fiscal Intermediaries/Carriers, now Medicare Administrative Contractors (MACs)  and their divisions such as the DMERCs, were authorized to establish policies now known as (LMRPs) Local Coverage Determinations (LCDs).

35.     When a service is not governed by a NCD, each Carrier could issue an LCD identifying indications and limitations of coverage and payment.  *See* 42 U.S.C. 1395kk-1(a)(4).

36.     LCDs establish specific criteria for initial and continued coverage of a service and identify circumstances under which Medicare will deny coverage for a service as not reasonable and necessary.  *See* 42 C.F.R. §400.202.

37.    The Social Security Act defines Local Coverage Determination as:

> (B) Definition of local coverage determination.
> For purposes of this section, the term "local coverage determination" means a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary or carrier-wide basis under such parts, in accordance with section 1862(a)(1)(A). 42 U.S.C. §1395ff (f)(2)(B).

38.    Each of MACs publishes and provides LCDs to the providers in its region.

39.    Medicare does not pay for medical treatments or diagnostic services that are not reasonable and necessary. 42 U.S.C. §1395y(a)(1)(A), 42 CFR §411.15(k).

40.    CMS publishes a Medicare Program Integrity Manual which instructs the MACs that when determining whether a treatment is reasonable and necessary under section 1395(y)(a)(1)(A), they may apply the so-called "reasonably feasible and medically appropriate least costly" alternative policy.  (Chapter 13.4.A, Rev. 71, April 9, 2004).  Chapter 13 of the Medicare Program Integrity Manual provides the following detailed information regarding LCDs:

> 13.1.3 - Local Coverage Determinations (LCDs)
> (Rev. 165, Issued: 10-06-06, Effective: 09-11-06, Implementation: 10-26-06)
>
> Section 522 of the Benefits Improvement and Protection Act (BIPA) created the term "local coverage determination" (LCD). An LCD is a decision by a Medicare administrative contractor (MAC), fiscal intermediary or carrier whether to cover a particular service on a MAC-wide, intermediary wide or carrier-wide basis in accordance with Section 1862(a)(1)(A) of the Social Security Act (i.e., a determination as to whether the service is reasonable and necessary).
> . . .

## 2.    The New York Medicaid Program

41.    The New York State Medicaid Program is authorized by Title XIX of the Social Security Act. 42 U.S.C. §§ 1396 *et seq*. Medicaid is a joint federal-state program that provides

healthcare benefits, including laboratory services coverage, for certain groups including the poor

and disabled. The New York Medicaid program is required to implement a "State Plan"

containing certain specified minimum criteria for coverage and payment of claims in order to

qualify for federal funds for Medicaid expenditures. 42 U.S.C. § 1396a. The federal portion of

each state's Medicaid payments, known as the Federal Medical Assistance Percentage, is based

on a state's per capita income compared to the national average. 42 U.S.C. § 1396d (b).

> Medicaid guidance, (e.g., the "New York Medicaid Provider Manual for Laboratory Services) is issued to give Medicaid providers the policies and procedures needed to properly bill and be appropriately paid for covered services provided to eligible New York Medicaid recipients. Physicians and laboratories certify in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid. New York's "Medicaid Provider Enrollment Application" must be completed by any person or entity desiring to receive payment for services provided to Medicaid recipients. To be eligible to receive direct or indirect payments for services rendered to New York Medicaid Program recipients, a provider must certify that the provider understands "that false claims, statements, documents, or concealment of material facts may be prosecuted under applicable federal and state laws."

New York Provider Enrollment Application, Section VII, Certification,

42.    The New York Medicaid Provider Laboratory Handbook warns that Medicaid

does not pay for services unless they are medically necessary as evident from documentation in

the enrollee's medical record.  The Handbook also makes clear the warning that knowingly

making a claim for inappropriate or unnecessary services is forbidden.  Finally, with each claim,

Shiel and Fresenius are required to certify that the laboratory services were furnished in

accordance with applicable federal and state laws and regulations, and that no material fact has

been omitted from the claim form.

43.     Pursuant to New York's Electronic Claims Submission Agreement, all providers must abide by all Federal and State statutes, rules, regulations, and manuals governing the New York Medicaid program. The agreement also requires providers to certify that each claim is in compliance with all federal and state laws and the conditions on the claim form, including that "the services . . . were medically indicated and necessary to the health of this patient" and that the provider understands "that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

### 3.     The New Jersey Medicaid Program

44.     The New Jersey State Medicaid Program is authorized by Title XIX of the Social Security Act. 42 U.S.C. §§ 1396 *et seq*. Medicaid is a joint federal-state program that provides healthcare benefits, including laboratory services coverage, for certain groups including the poor and disabled. The New Jersey Medicaid program is required to implement a "State Plan" containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures. 42 U.S.C. § 1396a. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage, is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d (b).

45.     Physicians and laboratories certify in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid. New Jersey's "Medicaid Provider Enrollment Application" must be completed by any person or entity desiring to receive payment for services provided to Medicaid recipients.

### 4.      Regulations Regarding Coverage for Laboratory Tests

46.      Medicare and New York and New Jersey Medicaid regulations both make clear that laboratory tests must be ordered by the physician treating the patient for the treatment of a specific illness or injury, that laboratory test orders that are not individualized too patient need (or for which the need is not documented in the patient chart) are not covered services, and that claims for such services must be denied.

### a.      Medicare Coverage for Laboratory Tests

47.      Laboratory services must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), as set forth at 42 C.F.R. Part 493.

48.      Medicare Part B pays for covered diagnostic laboratory tests that are furnished by a laboratory. 42 C.F.R. § 410.32(d)(v). "Clinical laboratory services involve the . . . examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition." Medicare Benefit Policy Manual ("MBPM"), (Pub. 100-02), Ch. 15, § 80.1, available at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf (visited March 15, 2014).

49.      Medicare Part B only covers services, including diagnostic laboratory services, that are reasonable and necessary for the diagnosis or treatment of an illness. *See* 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under [Medicare] part A or part B . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]")

12

50.     Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." The MPBM's "Requirements for Ordering and Following Orders for Diagnostic Tests" define an "order" as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary . . . . [T]he physician must clearly document, in the medical record his or her intent that the test be performed." MPBM, Ch. 15, Section 80.6.1.

51.     Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. 42 C.F.R. § 410.32(a). Clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a). MPBM, Ch. 15, § 80.1.

52.     To assess whether those services are reasonable and necessary and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries and prohibits payment "to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.  42 U.S.C. § 1395l(e); *see also* 42 U.S.C. § 1395u(c)(2)(B)(i) ("The term 'clean claim' means a claim that has no defect or impropriety (including any lack of any required substantiating documentation) . . . .").

53.     Medicare regulations expressly state that a laboratory's claim for a service will be denied if there is not sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary. 42 C.F.R. § 410.32(d)(3)

54.     CMS regulations further empower laboratories to request documentation from physicians regarding medical necessity:

> (iii) Medical necessity. The entity submitting the claim may request additional diagnostic and other medical information from the ordering physician or nonphysician practitioner to document that the services it bills are reasonable and necessary. 42 C.F.R. § 410.32(d)(3).

55.     The Department of Health and Human Services, Office of Inspector General ("HHS-OIG") has published Compliance Program Guidance for Clinical Laboratories in the Federal Register. 63 Fed Reg. 45076 (Aug. 24, 1998), available at https://oig.hhs.gov/authorities/docs/cpglab.pdf.  (Visited January 17, 2016.)  Among other things, the HHS-OIG guidance clarifies that laboratory order forms should emphasize the need for a justification and assessment of each test ordered and that Medicare does not pay for tests for screening purposes:

56.     Therefore, Medicare may deny payment for a test that the physician believes is appropriate, but which does not meet Medicare coverage criteria (e.g., done for screening purposes) or where documentation in the entire patient record, does not support that the tests were reasonable and necessary for a given patient.

. . .

> a. Requisition design: While HCFA [(CMS)] does not design or approve requisition forms, laboratories should construct the requisition form to capture the  correct program information as required by Federal or private health care  programs and to promote

14

the conscious ordering of tests by physicians or other authorized individuals. The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill. . . **The form should contain a statement indicating that Medicare generally does not cover routine screening tests.**

. . . .

### b.  New York Medicaid Coverage for Laboratory Tests

57.  New York Medicaid also requires that testing be individualized to the medical needs of patients and must be medically necessary.

### c.  Self-Referral and Anti-Kickback Prohibitions

### (1).  The Stark Law

58.  The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for twelve categories of "designated health services" ("DHS"), including clinical laboratory services, if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception. 42 U.S.C. §§ 1395nn; *see also* 42 C.F.R. §§ 411.351 *et seq*.

59.  Compliance with the Stark Law is a condition of payment by the Medicare program. Medicare may not pay for any DHS provided in violation of the Stark Law. *See* 42 U.S.C. §§ 1395nn(a)(1), (g)(1).

60.  The regulations interpreting the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis . . . ." 42 C.F.R. § 411.353(d).

15

61.     A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

62.     Effective October 1, 2008, "a physician is deemed to 'stand in the shoes' of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if -- (A) The only intervening entity between the physician and the entity furnishing [DHS] is his or her physician organization; and (B) The physician has an ownership or investment interest in the physician organization." 42 C.F.R. § 411.354(c)(1)(ii).

63.     Under the Stark Law, an "entity is considered to be furnishing DHS if it . . . [is the] entity that has presented a claim to Medicare for the [DHS] . . . ." 42 C.F.R. § 411.351.

64.     A "referral" includes "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any [DHS] for which payment may be made under Medicare Part B . . . ." 42 C.F.R. § 411.351.

65.     The Stark Law and its interpretive regulations contain exceptions for certain compensation arrangements. The statute and regulations also exempt certain items from the definition of "remuneration," including items "used solely to (I) collect, transport, process, or store specimens for the entity providing the item, device, or supply, or (II) order or communicate the result of tests or procedures for such entity." 42 U.S.C. § 1395nn(h)(1)(C)(ii); 42 C.F.R. § 411.351.

### (2).    The Anti-Kickback Statute

66.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or potentially harmful to patients. To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. The statute was first enacted in 1972, and was strengthened in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and ©; 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

67.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs. In pertinent part, the statute provides:

> (b) Illegal remunerations . . .
>
> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person–
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

17

>> (B) to purchase, lease, order or arrange for or recommend
>> purchasing, leasing or ordering any good, facility, service, or item for

which payment may be made in whole or in part under a Federal health care program,  shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b.

68.     Compliance with the Anti-Kickback Statute is a condition of payment by the Medicare program. 42 U.S.C. § 1320a-7(b)(7).

## IV.    DEFENDANTS' FRAUDULENT SCHEMES

69.     Defendants knowingly submitted and caused to be submitted false claims to Medicare and New York and New Jersey Medicaid for non-covered laboratory testing and testing that was not reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 410.32(a); MBPM, Ch. 15, Section 80.6.1.

70.     Shiel illegally paid skilled nursing facilities and physicians remuneration in the form of gifts, expensive entertainment, payment of expenses for advertising, payment of expenses for EMR licensing, phlebotomists, and office support staff.

71.     Since March 23, 2010, defendants have knowingly failed and refused to report and return overpayments in violation of 42 USC §1320a-7k(d).  This requirement was established in 2010 and specifically make the failure to report and return overpayments enforceable under the False Claims Act [31 USC §3729(b)(3) and applies the same broad definitions of "knowing" and "knowingly" as the FCA. [§1128J, as added March 23, 2010 by P.L. 111-148, Title VI, Subtitle E, §6402(a), 124 Stat. 753.)

A.     **Shiel and Fresenius Knowingly Submitted Claims to Medicare and Medicaid for Tests That Were Not Reasonable and Necessary by Falsely Submitting Diagnostic Codes**

72.     Defendants knew that, as a laboratory and Medicare supplier, Shiel, and then Fresenisus it had an obligation to submit claims to Medicare only for tests that were reasonable and necessary for the diagnosis or treatment of individual patients.  Documentation of medical necessity is required before Medicare and Medicaid will pay for laboratory claims.  With only a few exceptions, the programs will not pay for routine checkups or screening tests, defined as "diagnostic procedures performed in the absence of signs or symptoms."

73.     Shiel paid its account representatives modest salaries and supplemented those salaries with commissions the representatives could earn based upon the laboratory's revenue earned on their accounts.

74.     Physicians and skilled nursing facilities only infrequently inserted ICD-9 (now ICD-10) codes on their patients' laboratory requisition forms and typically ignored the account representatives' requests that they provide this information.  Because of this, Shiel would not get paid and the account representatives would not earn commissions unless Shiel itself inserted the codes.

75.     Shiel taught its account representatives to insert codes themselves, with no knowledge of whether the codes were proper. As commissioned sales people, their only concern was whether the codes would get Medicare to pay for the tests.  Jack Basch and other Shiel executives directed their account representatives by telling them, "You've got to put down an ICD-9."  Or, "You've just got to do it."

76.     Shiel office workers routinely received printed "missing diagnosis" sheets for laboratory test requisitions which were unpaid because ICD-9 codes were missing, or because the codes which had been selected did not result in payment.  These requisitions would either be put in the account representatives' inboxes, left at billing office desks, or in some cases, delivered to the account representatives.

77.     Shiel representatives who had nursing home accounts also routinely inserted codes to justify reimbursement even when newly admitted patients were receiving "baseline" tests which Medicare does not pay for.  The patients also had regularly scheduled routine tests which, in the absence of signs, symptoms, or diagnoses, are also not reimbursable.

78.      In the fall of 2014 Shiel and Fresenius helped introduce software which its nursing home accounts would use to order laboratory tests.  The software required the nursing homes to enter a diagnostic code for the order to  be processed.

79.     However, this did little or nothing to meet Medicare's requirement that orders include ICD-9 codes reflecting the medical condition which made the test necessary and defendants' own chief compliance officer acknowledges that at least half of the tests are ordered or billed with improper diagnostic coding.

80.     There are two main reasons for this.  First, the software-facilitated coding prompt does not require that the nursing home enter the correct code that demonstrates the medical necessity of the test. It does not even require that the nursing home enter a code which, although inaccurate, would nonetheless trick Medicare into paying for the test. Entering any diagnostic code will cause the test requisition to process.

81.     Second, defendants prepared "cheat sheets" listing diagnostic codes which would trigger Medicare payment even if they had nothing to do with the patients' condition. Defendants trained nursing home employees to use the "cheat sheets" to enter diagnostic codes which would trick Medicare into paying  for the laboratory tests whether or not there was any genuine evidence that the tests were medically necessary.

82.     The falsification of ICD-9 and ICD-10 codes was known by Fresenius Laboratories' Chief Operating Officer and the vice-president of Billing and Contracting.

**B.**     **Shiel and Fresenius Knowingly Submitted Claims to Medicare and Medicaid for Tests That Were Not Reasonable and Necessary by Adding Orders for Expensive and Unnecessary Tests**

83.     In  2014, after Fresenius acquired Shiel, a sales contest was held which offered the most successful sales representative a thirty percent commission on accounts generating over $50,000 in monthly billings.  The contest winner, Sal Prifitera, boasted that he had done this by automatically adding orders for expensive services such as Vitamin D assays (CPT Code 82306 and Oxidized LDL tests.  (CPT Code 83516.)

84.     This was hardly the first time Prifitera had done this.  In a December 9, 2004 email, Prifitera was singled out for praise by then vice president of sales Todd Schild for getting a medical practice to include *routine* Oxidized LDL tests on the chemistry panels it ordered. Schild pointed out that by doing this Prifitera had **doubled** Shiel's sales to this medical group, to $40,000 per month.

85.     The expensive oxidized LDL tests are governed by Medicare's general requirement that routine screening tests are not reimbursable.

86.     In  New York, reimbursement for Vitamin D assays are governed by Local

Coverage Determination L29510 promulgated by NGS, which became effective September 1,

2009.  Pursuant to this LCD, routine screening tests for Vitamin D insufficiency are not

reimbursable, and the assay is only indicated for patients who have been diagnosed with a few

very specific diseases.[3]  Testing without one of these specific diagnoses may not properly be

billed to Medicare.

### C.      Defendants Gave Financial Inducements to Physicians in Exchange for Referrals in Violation of the Stark Law and Anti-Kickback Statute.

87.     Defendants have used a variety of means to provide financial inducements to

doctors and nursing homes to encourage and reward referring their patients to Shiel.

(A)      Physicians are now required to switch their practices to electronic medical

records (EMRs).  Shiel pays the monthly licensing fee of approximately $200 per month for

cloud-based EMR services.  Relator is informed and believes and based thereon alleges that these

monthly payments are made on behalf of approximately one hundred or more physicians who are

customers of Shiel account representative Sal Prifitera.

(B)      Relator is informed and believes and based thereon alleges that Shiel

allowed itself to be overcharged by another EMR company, ELLKAY LLC, by a factor of

approximately 400%, using some or all of the nearly one million dollars in funds generated by

the overcharge to induce physician referrals.

---

[3]Vitamin D assays are indicated for patients with any  of the following conditions: chronic kidney disease Stage III or greater; osteoporosis; osteomalacia; osteopenia; hypocalcemia; hypercalcemia; hypoparathyroidism; hyperparathyroidism; or rickets.  The assay test is also indicated to monitor the effectiveness of Vitamin D replacement therapy in patients with documented vitamin D deficiency

(C)     Shiel recently authorized one account representative to spend thousands of dollars for a party hosted by a physician, Amir Rabaddi, who gave business to Shiel .

(D)     Shiel also provides financial inducements to physicians by placing phlebotomists and other personnel in doctors' offices without charge, or by paying doctors' own employees to draw blood samples.  For example, a Shiel employee who is an assistant to sales representative Brian Gluck actually reports to work at a Boro Park, New York  OB GYN practice where she performs office functions which directly support the doctors.

## D.     Shiel Has Given Illegal Financial Inducements to Nursing Homes in Exchange for Referrals

88.     When and administrator at a nursing home which gave its clinical laboratory work to Shiel opened an  insurance agency as a side business, the administrator asked for and received Shiel's Workers' Compensation insurance account.

89.     Shiel also spends thousands of dollars every year on gifts of expensive consumer electronics for its favored skilled nursing facility accounts.

## E.     Defendants Knew That These Financial Inducements Were Illegal

90.     Defendants knew that compliance with the Stark Law and Anti-Kickback Statute was a condition of payment by Medicare. Defendants explicitly certified that, as a Medicare supplier, they would comply with all Medicare laws and regulations, including the Stark Law and Anti-Kickback Statute, on Form CMS-855B and CMS-1500 claims forms.

91.     Defendants knowingly compensated physicians and skilled nursing facilities in exchange for referrals, in violation of the Stark Law and Anti-Kickback Statute. Defendants paid

kickbacks and dispensed gifts expressly to obtain referrals, to increase the number of tests

referred, and to prevent customers from affiliating with competitors.

92.     At least one Shiel account representative would purchase gifts for customers, and

was told to manufacture receipts that "make sense".  With company approval, he would turn in

fake invoices for repair work or would turn in receipts for expensive personal items that appear

to be business-related and would cover the costs of the gifts he had been directed to purchase,

thus concealing the inducement in the event of an audit or investigation.

## V.      THE UNITED STATES AND THE STATES OF NEW YORK AND NEW JERSEY WERE HARMED BY DEFENDANTS' CONDUCT

93.     As a result of Defendant's conduct, the Medicare program paid Defendants tens of

millions of dollars for false and/or fraudulent claims for laboratory tests.

94.      Medicare was directly affected by Defendant's fraudulent schemes. Estimates of

Medicare / Medicaid, or Proxy Estimates of SNF residents.

95.      Medicare was particularly susceptible to Defendants' fraudulent schemes because

it does not require a patient co-payment on laboratory services. Because Medicare patients were

not required to pay out-of-pocket for laboratory services, they had no reason to inquire into the

charges to Medicare associated with them.

96.     The damages to the United States and the States of New York and New Jersey

arising from the Defendants' submission of claims to Medicare and Medicaid referred by these

physicians in violation of Stark Law is also in the millions of dollars.

97.     The damages to the United States and the States of New York and New Jersey

arising from the Defendants' submission of claims to Medicare and Medicaid for laboratory tests

that were not reasonable and necessary for the diagnosis or treatment of patients, and for which the need was not assessed or documented for individual patients, including the claims referenced in Section IV, E above, likely exceeds tens of millions of dollars.

## COUNT I

### (Federal False Claims Act: Presentation of False Claims)

### (31 U.S.C. § 3729(a)(1) and (a)(1)(A))

98.     Relator repeats and reloads and hereby incorporates by reference paragraphs 1 through 97 inclusive set out above as though fully set forth herein.

99.     Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States and New York and New Jersey Medicaid, including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

100.     Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT II

### (Federal False Claims Act: False Statements Material to False Claims)

### (31 U.S.C. § 3729(a)(1)(B))

101.     Relator repeats and reloads and hereby incorporates by reference paragraphs 1 through 97 inclusive set out above as though fully set forth herein.

102.     Defendants knowingly made, used, and caused to be made or used, false records or statements — i.e., false statements regarding compliance and coverage for its services and

false statements on forms CMS-855B, 837P and CMS-1500—to get false or fraudulent claims paid and approved by the United States.

103.    Defendant's false certifications and representations were made to get claims paid even though there was no evidence of medical reasonableness or medical necessity, and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendant's statements and actions.

104.    The false certifications and representations made and caused to be made by Defendant were material to the United States' and New York and New Jersey Medicaid's payment of the false claims.

105.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT III

## FAILURE TO RETURN OVERPAYMENTS FALSE CLAIM

### (Federal False Claims Act; 31 U.S.C. § 3729(b)(e)

106.    Relator repeats and reloads and hereby incorporates by reference paragraphs 1 through 97 inclusive set out above as though fully set forth herein.

107.    Defendants, and each of them have known that they had received overpayments under Medicare.  Fresenius has known this for two reasons:  First, Fresenius' more rigorous compliance program resulted in a nearly twenty percent drop in sales during the first full year after Shiel's acquisition, which certainly should have alerted Fresenius to the likelihood that Shiel had been engaging in fraudulent practices. Second, two of Shiel's leading malefactors, Jack Basch and Moshe Klaus, have continued in senior leadership positions for Fresenius.

108.     Defendants have nonetheless refused to conduct audits that are within their power to conduct in the full knowledge that those audits would reveal the precise amount of overpayment refunds due Medicare because each of the previously enumerated false billing schemes.

109.     Defendants' refusal to calculate or estimate the amount of overpayment refunds owed is a separate violation of 31 U.S.C. §3729(b)(3) of the False Claims Act.

## COUNT IV

### VIOLATION OF THE NEW YORK FALSE CLAIMS ACT

### (NEW YORK STATE FINANCE LAW, - ARTICLE XIII §§ 187 *et seq.*)

110.     Relator repeats and reloads and hereby incorporates by reference paragraphs 1 through 97 inclusive set out above as though fully set forth herein.

111.     The New York Medicaid Provider Enrollment Application requires a certification that the provider agrees to "abide by all applicable Federal and State laws as well as the rules and regulations of other New York State agencies peculiar to the type of program covered by this enrollment application."

112.     The New York False Claims Act (NY State Finance Law, Ch. 56 of the Consolidated Laws - Article XIII §§187 *et seq.*) provides in pertinent part as follows:

§189. Liability for certain acts.

> 1. Subject to the provisions of subdivision two of this section, any person who:

> (a) knowingly presents, or causes to be presented, to any employee, officer or agent of the state or a local government, a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

\*\*\*

(g) knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or local government;

shall be liable to the states or a local government as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.

113.    Pursuant to Section 188(3) of the New York False Claims Act, proof of specific intent to defraud is not required.

114.    As set forth herein, Defendant has violated the New York False Claims Act in New York State Finance Law Ch.56, Article XIII §§ 189(1)(a), 189(1)(b), 189(1)©, and 189(1)(g).

115.    As explained in detail Defendants have submitted false claims and/or false records for laboratory tests for which there was no evidence of medical necessity or medical reasonableness, or which were procure through the use of illegal financial inducements; or both.

116.    As also explained in detail, Defendants have refused to calculate or repay overpayments despite knowledge that they have received substantial overpayments.

117.    The Defendants knowingly violated N.Y. State Fin. Law § 189 and knowingly presented or caused to be made, used and presented hundreds of thousands of false claims to the State of New York from 2008 to the present, by violating the Federal Anti-Kickback Act, as described herein.

118.    The State of New York, by and through the State of New York Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

119.    Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of New York's payment decision.

120.    As a result of the Defendants' violations of N.Y. State Fin. Law § 189, the State of New York has been damaged.

121.    For each violation of the New York False Claims Act, New York is entitled to recover treble damages from Defendant. *See* New York False Claims Act§189 (h).

122.    In addition, for each violation of the New York False Claims Act, New York is entitled to recover from Defendant a civil penalty of not less than $6000, and not more than $12,000. *Id.*

123.    There are no bars to recovery under N.Y. State Fin. Law. § 190(9), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.Y. State Fin. Law § 190(2) on behalf of himself and the State of New York. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of New York. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

## COUNT V

### VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT

124.     Relator repeats and reloads and hereby incorporates by reference paragraphs 1

through 107  inclusive set out above as though fully set forth herein.

125.      The New Jersey Medicaid Provider Enrollment Application requires a

certification that the provider agrees "to comply with all applicable State and Federal Medicaid

laws and policies, and rules and regulations promulgated pursuant thereto . . . ." and agrees "to

comply with Section 1909 of P.L. 92-603, Section 242© which makes it a crime for persons

found guilty of making any false statement or representation of a material fact in order to receive

any benefit or payment under the Medicaid Assistance program…." Provider Agreement

Between New Jersey Department of Health and Senior Service and Provider, at 1, Items 1 and 5.

> § 2A:32C-3 of  the New Jersey Statutes provides liability for any
> person who-
>
> (a) knowingly presents or causes to be presented to an employee,
> officer or agent of the State, or to any contractor, grantee, or other
> recipient of State funds, a false or fraudulent claim for payment or
> approval;
>
> (b) knowingly makes, uses, or causes to be made or used a false
> record or statement to get a false or fraudulent claim paid or
> approved by the State;
> (c) conspires to defraud the State by getting a false or fraudulent
> claim allowed or paid by the State.
>                                                            . . .
>
> (g)     Knowingly makes, uses, or causes to be made or used or to
> be used a false record or statement to conceal, avoid, or decrease
> an obligation to pay or transmit money or property to the State.

126.    Pursuant to §2A:32C-2 proof of specific intent to defraud is not required.

127.     As explained in detail Defendants have submitted false claims and/or false records for laboratory tests for which there was no evidence of medical necessity or medical reasonableness, or which were procure through the use of illegal financial inducements; or both.

128.     As also explained in detail, Defendants have refused to calculate or repay overpayments despite knowledge that they have received substantial overpayments.

129.     The Defendants knowingly violated N.J. Stat. Ann. § 2A:32C-3 and knowingly presented false claims to the State of New Jersey from 2009 to the present, by violating the Federal Anti-Kickback Act, as described herein.

130.     The State of New Jersey, by and through the State of New Jersey Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

131.     Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of New Jersey's payment decision.

132.     As a result of the Defendants' violations of N.J. Stat. Ann. § 2A:32C-3189, the State of New Jersey has been damaged.

133.     For each violation of the New Jersey False Claims Act, New Jersey is entitled to recover treble damages from Defendant under the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32-C1–2A:32-C18.

134.     In addition, for each violation of the New Jersey False Claims Act, New Jersey is entitled to recover from Defendant a civil penalty of not less than $5,500, and not more than $11,000. *Id.*

135.    There are no bars to recovery under N.J. Stat. Ann. § 2A:32C-9(c), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.J. Stat. Ann. § 2A:32C-5(b) on behalf of himself and the State of New Jersey. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of New Jersey.

## PRAYER FOR RELIEF

WHEREFORE, the Relator demands and prays that judgment be entered in favor of the United States and the States of New York and New Jersey in against Defendants as follows:

1.    For the amount of the damages to the United States or the State of New York or the State of New Jersey, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper;

2.    For the Relator, the maximum amount of the Relator's share allowed by law;

3.    Reimbursement for all reasonable expenses that Relator incurred in connection with this action;

4.    An award of reasonable attorneys' fees and costs; and

5.    Such further relief as this Court deems just and proper.

Respectfully submitted,

Dated: March 3, 2016

Steven J. Marcus
NY Bar No. 1231307
431 W. 22nd Street
New York, NY 10011
(212) 989-6187
sjmarcus3@aol.com

Dated: March 3, 2016

LAW OFFICES OF MARK ALLEN KLEIMAN

Mark Allen Kleiman (CSB #115919)
*(to be admitted pro hac vice)*
Pooja Rajaram (CSB # 241777)
*(to be admitted pro hac vice)*
2907 Stanford Avenue
Venice, CA 902922
310-306-8094
310-306-8491 (fax)
mkleiman@quitam.org
prajaram@quitam.org

Dated: March 3, 2016

PIERCE LLC

Howard L. Pierce
PIERCE LLC
NY Bar No. HP5655
433 South Main Street, Suite. 228
West Hartford, CT 06110
Telephone:  860-560-8177
hpierce@piercellclaw.com

33

## DEMAND FOR JURY TRIAL

The Relator demands a jury trial in this case.

Respectfully submitted,

Dated: March 3, 2016

Steven J. Marcus
NY Bar No. 1231307
431 W. 22nd Street
New York, NY 10011
(212) 989-6187
sjmarcus3@aol.com

Dated: March 3, 2016

LAW OFFICES OF MARK ALLEN KLEIMAN

Mark Allen Kleiman (CSB #115919)
*(to be admitted pro hac vice)*
Pooja Rajaram (CSB # 241777)
*(to be admitted pro hac vice)*
2907 Stanford Avenue
Venice, CA 902922
310-306-8094
310-306-8491 (fax)
mkleiman@quitam.org
prajaram@quitam.org

Dated: March 3, 2016

PIERCE LLC

Howard L. Pierce
PIERCE LLC
NY Bar No. HP5655
433 South Main Street, Suite. 228
West Hartford, CT 06110
Telephone: 860-560-8177
hpierce@piercellclaw.com

34

## CERTIFICATION OF SERVICE

The undersigned certifies that on March 4, 2016 a copy of the foregoing **COMPLAINT**

**FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT** was placed in the United States

Mail, Certified Mail/Return Receipt Requested, first class, postage prepaid, addressed to:

Hon. Loretta Lynch
Attorney General
U.S. Department of Justice
10th & Constitution Ave., NW
Washington, DC  20530

Kenneth M. Abell
Assistant United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
(718) 254-6291
Kenneth.Abell@usdoj.gov


_____
MARK ALLEN KLEIMAN