UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, *ex rel.* JAMES
GORDON and YNKDY-2; STATE OF NEW
YORK, *ex rel.* JAMES GORDON and YNKDY-2;
and STATE OF NEW JERSEY, *ex rel.* JAMES
GORDON and YNKDY-2,

                    Relator,

      -against-

SHIEL MEDICAL LABORATORY; SHIEL
HOLDINGS, LLC; FRESENIUS MEDICAL CARE;
BIM MEDICAL, INC.; JACK BASCH;
FRESENIUS MEDICAL CARE HOLDINGS, INC.;
SPECTRA HOLDCO, LLC; and DOES 3-10,
Inclusive, et al.,

                  Defendants.

**MEMORANDUM & ORDER
16-CV-1090 (NGG) (TAM)**

NICHOLAS G. GARAUFIS, United States District Judge.

YNKDY-2 ("Relator") and James Gordon[1] bring this *qui tam* action on behalf of the United States of America, as well as the State of New York and the State of New Jersey against Shiel Medical Laboratory ("Shiel"), Fresenius Medical Care Holdings, Inc. ("Fresenius"), BIM Medical, Inc. ("BIM"), Spectra Holdco, LLC ("Spectra"), and Jack Basch (together, "Defendants"). (*See generally* FAC.) Relator and Gordon bring the following claims based on Defendants' alleged fraudulent schemes: (1) presentation of

---

[1] Relator brought this action on March 4, 2016. (*See* Compl. (Dkt. 1).) On March 2, 2017, Relator amended the complaint to add retaliation claims on behalf of "John Doe." (First Am. Compl. (Dkt. 9) ¶¶ 136-52.) When Relator filed the operative complaint, it revealed that James Gordon, previously known as "John Doe," is the principal of Relator, and added Gordon as a co-Relator and plaintiff. (Fourth Am. Compl. ("FAC") (Dkt. 111) ¶ 10.) For the sake of simplicity, the court refers to YNKDY-2 as "Relator," and James Gordon as Gordon.

false claims to the federal government pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729(a)(1) & (a)(1)(A); (2) making false statements material to false claims to the federal government pursuant to the FCA, 31 U.S.C. § 3729(a)(1)(B); (3) failure to return overpayments pursuant to the FCA, 31 U.S.C. § 3729(a)(1)(G); (4) violation of the New York False Claims Act ("NYFCA") pursuant to N.Y. Fin. Law art. 13 §§ 187, *et seq.*; (5) violation of the New Jersey False Claims Act ("NJFCA") pursuant to N.J. Stat. Ann. § 2A:32C-3; (6) illegal retaliation, on behalf of Gordon only, pursuant to the FCA, 31 U.S.C. § 3730(h); and (7) illegal retaliation, on behalf of Gordon only, pursuant to the New Jersey Conscientious Employee Protection Act ("NJ CEPA"), N.J.S.A. 34:19-1, *et seq. (See* FAC ¶¶ 182-238.) Pending before this court are Defendants' motions[2] to dismiss the action pursuant to Federal Rules of Civil Procedure ("Rule") 9(b) and 12(b)(6) for failure to state a claim, as well as Rule 12(b)(1) for lack of subject matter jurisdiction. (Fresenius Mot. (Dkt. 120-1); Defs.' Combined Suppl. Mot. (Dkt. 120-2); Fresenius Suppl. Mot. (Dkt. 120-3); Fresenius Reply (Dkt. 120-7); Basch Mot. (Dkt. 122-1); Basch Suppl. Mot. (Dkt. 122-3); Basch & BIM Joint Reply (Dkt. 122-8); BIM Mot. (Dkt. 124-1); BIM Suppl. Mot. (Dkt. 124-6).)[3] Relator opposes all of the motions. (*See generally* Relator's Opposition ("Opp.") (Dkt. 120-4).) For the reasons further outlined below, the court GRANTS Defendants' motions in their

---

[2] For the sake of simplicity, the court refers to all the briefs jointly filed by Fresenius and Spectra, as well as the arguments therein, as if they are Fresenius's briefs and arguments. Similarly, the court takes the same approach with respect to BIM's and Shiel's jointly filed briefs, referring to them as BIM's briefs or arguments.

[3] In addition to their arguments set forth in their supplemental briefs, Defendants maintain and assert their arguments raised in their initial motions to dismiss the Third Amended Complaint that Defendants claim remain relevant. (*See* Defs.' Combined Suppl. Mot. at 1.)

entirety and DISMISSES all of the claims in Counts I to VII with prejudice.

## I.    BACKGROUND

### A.    Factual Background[4]

Relator, a California corporation, and its principal, Gordon—who held a senior position within Shiel until 2017—bring this action against Defendants that engage in healthcare services. (FAC ¶¶ 10, 16(d).) Shiel performs laboratory testing that informs health care providers, including physicians, of chemical and biochemical changes in a patient's body. (*Id.* ¶ 3.) Defendant Basch, with others, purchased Shiel in 1994, about 32 years after its founding. (*Id.* ¶ 2.) Roughly two decades later, in 2013, Fresenius[5] acquired Shiel for nearly a quarter of a billion dollars, after which Shiel became BIM. (*Id.*) Defendant Basch is the Chief Executive Officer of the company. (*Id.*)

Companies like Shiel must submit a Medicare Enrollment Application form to continue to participate in the Medicare program. (*Id.* ¶ 26.) As relevant, "Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet," certain requirements of the Medicare statutes and regulations. (*Id.* ¶ 28.) To that end, Relator alleges that Shiel and

---

[4] The court draws the following facts from the FAC and any documents upon which it relies. For purposes of this motion to dismiss, the court assumes that these facts are true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022); *see also United States v. Spectra Holdco, LLC*, No. 17-CV-2732 (NGG) (JRC), 2024 WL 457110, at *1 n.1 (E.D.N.Y. Feb. 6, 2024) (same).

[5] Although the FAC identifies the purchaser of Shiel as Fresenius Medical Care of North America—not Fresenius Medical Care Holdings, Inc.—it later clarifies that the former has the same address as Spectra, which is part of the Fresenius network. (*See* FAC ¶¶ 17(a), (b).) Given these connections, the court does not distinguish between Fresenius Medical Care of North America and Fresenius Medical Care Holdings, Inc., referring to both of them as "Fresenius."

Fresenius officials signed a certification statement, "indicating that they understood that the laboratory was required to comply with Medicare laws, regulations, and program instructions, which include . . . the Stark Law and the Anti-Kickback Statute." (*Id.* ¶ 30.) Providers and suppliers submit a claim form—CMS 1500, or its electronic equivalent, 837P—to obtain Medicare and Medicaid reimbursements for certain outpatient items and services. (*Id.* ¶ 32.) On the CMS 1500 and 873P forms, providers and suppliers include certain information, such as "five-digit codes, including Current Procedural Terminology Codes ('CPT codes') and Healthcare Common Procedure Coding System ('HCPCS') Level II codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the 'rendering provider' and the 'referring provider or other source.'" (*Id.*) Moreover, since 1996, using the International Classification of Diseases, Edition 9 ("ICD-9"), laboratories must ensure that the ordering physicians describe the specific medical condition that justify the laboratory tests. (*Id.* ¶ 33.)[6] New York and New Jersey state laws and regulations contain similar requirements for their respective Medicaid programs. (*Id.* ¶¶ 47-55.)

The FAC alleges that since around 1996, Shiel has knowingly submitted hundreds of millions of dollars in false claims to the Medicare and New York and New Jersey Medicaid programs. (*Id.* ¶ 4.) Relator pleads that these claims were false based on three separate theories. First, Relator alleges that the claims were false because they were submitted for tests that were not reasonable and necessary. (*Id.* ¶¶ 4, 79, 83-126.) As to this category of alleged false claims, Relator further adds that Defendants "sought to, and did, cause many physicians to routinely order extensive

---

[6] Since October 1, 2015, "CMS required that the new, ICD-10 codes be used instead." (FAC ¶ 33 n.2.)

and expensive laboratory tests merely to make more money," despite knowing that Medicare only covers those tests that are reasonable and necessary pursuant to 42 U.S.C. § 1395y(a)(1)(A). (*Id.* ¶ 5.) Second, the FAC also pleads that Defendants submitted false claims because Defendants submitted claims for tests that were furnished pursuant to prohibited referrals resulting from Shiel's improper financial relationships with physicians and skilled nursing facilities ("SNF"). (*Id.* ¶¶ 4, 127.) This scheme, according to the FAC, violates the Physician Self-Referral Law, 42 U.S.C. § 1395nn (the "Stark Law"). (*Id.* ¶¶ 4, 127.) Third, Relator alleges that "Defendants illegally paid [SNFs] and physicians remuneration in the form of gifts, expensive entertainment, payment of expenses for advertising, payment of expenses for EMR licensing, phlebotomists, and office support" in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (the "AKS"). (*Id.* ¶¶ 80, 129-51; *see also id.* ¶ 6.) The complaint also alleges that "Shiel offered kickbacks in the form of substantial discounts to nursing homes on their Medicare Part A[7] lab tests in exchange for an exclusive contract to Shiel to do all the lab work for the nursing homes' Medicare Part B[8] patients." (*Id.* ¶¶ 6, 81, 155.)

Moreover, Relator adds that Gordon "does not have personal knowledge of claims processing as he was in sales." (*Id.* ¶ 10.) The FAC also pleads that "[w]ith only the rarest of exceptions, [Gordon] did not have access to the actual claim submissions or (except for the endpoint of a claim rejection) any of the technical details of paper or electronic claim submissions beyond his role with the requisition data[.]" (*Id.*) According to the complaint,

---

[7] "Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care." (FAC ¶ 34.)

[8] "Medicare Part B authorizes the payment of federal funds for medical and other health services, including without limitation physician services, supplies and services incident to physician services, laboratory services, outpatient therapy, diagnostic services, and radiology services." (*Id.*)

Gordon eventually contacted federal law enforcement to alert them to the alleged wrongdoing at Shiel. (*Id.*) And, "[a]s a result of Defendants' conduct, the Medicare program paid Defendants tens of millions of dollars for false and/or fraudulent claims for laboratory tests." (*Id.* ¶ 177.)

In addition to the FCA (Counts I & II), NYFCA (Count IV), and NJFCA (Count V) claims, in Count III, Relator alleges that "Defendants' refusal to calculate or estimate the amount of overpayment refunds owed is a separate violation of 31 U.S.C. § 3729(b)(3) of the False Claims Act." (*Id.* ¶ 194.)[9] Lastly, on behalf of Gordon and against Fresenius and Spectra only, Relator brings illegal retaliation claims pursuant to 31 U.S.C. § 3730(h) (Count VI) and N.J.S.A. 34:19-1, *et seq.* (Count VII). (*Id.* ¶¶ 222-38.) In particular, Relator alleges that after "ma[king] his dissatisfaction with Defendants' illegal conduct well known throughout the company," (*id.* ¶ 226), "within a month of Fresenius receiving" the information about a False Claims Act complaint filed against it, "Gordon was fired" from his job, (*Id.* ¶¶ 230-31.)

### B.  Procedural History

Relator filed its original complaint on March 4, 2016. (Compl.) In 2017, while the action was still under seal, Relator amended the complaint for the first time. (First Am. Compl.) After this court granted leave, on February 9, 2022, Relator filed its Second Amended Complaint. (Second Am. Compl. (Dkt. 22); *see also*

---

[9] Because the FAC alleges that Defendants' failure to return overpayment is a violation under 31 U.S.C. § 3729(b)(e)—a nonexistent provision of the FCA—the court construes Relator's Count III claim as a reverse false claim brought pursuant to 31 U.S.C. § 3729(a)(1)(G), which, in relevant part, imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. § 3729(a)(1)(G).

Min. Entry Dated 12/28/2021.) On June 14, 2022, after the United States and the states of New York, New Jersey, and Connecticut declined to intervene, the court unsealed the case. (Order to Unseal (Dkt. 28).) Thereafter, in May 2023, on consent of the parties, Relator amended the complaint for the third time to substitute John Doe Defendants for Fresenius and Spectra. (*See* Third Am. Compl. ("TAC") (Dkt. 65).) On February 29, 2024, after this court granted Relator's motion for leave to amend its complaint, (*see* Mem. & Order Dated 02/26/2024 (Dkt. 110)), Relator filed the instant complaint, revealing that Gordon is the principal of Relator, (FAC ¶ 10.)

The FAC includes the following claims based on Defendants' alleged fraudulent schemes: (1) presentation of false claims to the federal government pursuant to the FCA, 31 U.S.C. §§ 3729(a)(1) & (a)(1)(A); (2) making false statements material to false claims to the federal government pursuant to the FCA, 31 U.S.C. § 3729(a)(1)(B); (3) failure to return overpayments pursuant to the FCA, 31 U.S.C. § 3729(a)(1)(G); (4) violation of the NYFCA pursuant to N.Y. Fin. Law art. 13 §§ 187, *et seq.*; (5) violation of the NJFCA pursuant to N.J. Stat. Ann. § 2A:32C-3; (6) illegal retaliation, on behalf of Gordon only, pursuant to the FCA, 31 U.S.C. § 3730(h); and (7) illegal retaliation, on behalf of Gordon only, pursuant to the NJ CEPA, N.J.S.A. 34:19-1, *et seq.* (*See id.* ¶¶ 182-238.) Defendants' pending motions followed.

## II. LEGAL STANDARDS

### A. Rules 12(b)(1) & (2)

Determining whether the court has jurisdiction over the claims (subject-matter jurisdiction) and the parties (personal jurisdiction) is a threshold issue. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible

and without exception.");[10] *see also Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778 (2000) ("*Stevens*") ("Questions of jurisdiction, of course, should be given priority—since if there is no jurisdiction there is no authority to sit in judgment of anything else."). Because "[j]urisdiction is power to declare the law, . . . when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co.*, 523 U.S. at 94; *Lunney v. United States*, 319 F.3d 550, 560 (2d Cir. 2003) (same).

Rule 12(b)(1) allows a defendant to move to dismiss an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A motion to dismiss for lack of Article III standing challenges the subject-matter jurisdiction of a federal court and, accordingly, is properly brought under" Rule 12(b)(1). *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020); *see also City of New York v. Milhelm Attea & Bros., Inc.*, 550 F. Supp. 2d 332, 340 (E.D.N.Y. 2008) (recognizing that because "standing is 'a limitation on the authority of a federal court to exercise jurisdiction,' it is properly addressed within the context of a Rule 12(b)(1) motion" (quoting *All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006))). Moreover, "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d. Cir. 2000).

A court must also dismiss an action against a defendant over whom it lacks personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). On a motion to dismiss for lack of personal jurisdiction filed pursuant to Rule 12(b)(2), "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). And if "a district court relies on the pleadings and affidavits, and

---

[10] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

chooses not to conduct a full-blown evidentiary hearing, plaintiffs need only make a prima facie showing of personal jurisdiction over the defendant." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008). "A prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d. Cir. 2015) (summary order) (citing *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)). When deciding a motion to dismiss under Rule 12(b)(2), the court may look beyond the four corners of the complaint and consider "affidavits and other written materials," while accepting "[t]he allegations in the complaint . . . as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012).

When the court determines whether it has personal or subject-matter jurisdiction, "the plaintiff need only make a *prima facie* showing of jurisdiction" if "the district court relies solely on the pleadings and supporting affidavits[.]" *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994). Though the court "will not draw argumentative inferences in the plaintiff's favor[,]" it will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." *Id.*

### B. Rules 12(b)(6) & 9(b)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility

that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).

The court "accept[s] all factual allegations [in the complaint] as true and draw[s] all reasonable inferences in favor of the plaintiff." *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 78 (2d Cir. 2017). And though "a court must accept as true all of the allegations contained in a complaint . . . [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. To that end, "only a complaint that states a plausible claim for relief survives a motion to dismiss[,]" and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"[C]laims brought under the FCA fall within the express scope of Rule 9(b)." *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995) (explaining that "[i]t is self-evident that the FCA is an anti-fraud statute"); *see also* 31 U.S.C. § 3729(a) (utilizing phrases like "false or fraudulent" and "intending to defraud"). To that end, Rule 9(b) requires that "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 153 (2d Cir. 2024) (same); *United States ex rel. Polansky v. Pfizer, Inc.*, No. 4-CV-704, 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (explaining that the heightened pleading standard applies to "state statutes similar to the FCA" as well). And "[c]laims pled under FCA-analogous state and municipal laws must also be pled in compliance with Rule 9(b)." *United States v. Novartis Pharms. Corp.*, No. 13-CV-3700 (KMW), 2020 WL 1436706, at *3 (S.D.N.Y. Mar. 24, 2020). Although "the FCA has a liberal scienter requirement," further discussed below, that requirement "does not conflict with

Rule 9(b), since '[m]alice, intent, knowledge, and other condition of mind of a person may be [alleged] generally.'" *Gold*, 68 F.3d at 1477 (quoting (Fed. R. Civ. P. 9(b)); *see also United States v. Strock*, 982 F.3d 51, 66 (2d Cir. 2020) ("Claims under the FCA are subject to the particularity requirement of [Rule] 9(b).").

## III. DISCUSSION

### A. Subject-Matter Jurisdiction

#### 1. Relator's Standing – FCA Claims

Relator has standing to bring FCA claims against Defendants. Congress designed the FCA such that "[a] person may bring a civil action for a violation of section 3729 for *the person* and for the United States Government." 31 U.S.C. § 3730(b)(1) (emphasis added). Although the word "person" appears in various sections of the FCA, the statute defines it for the purposes of Section 3733 only. *See id.* § 3733(l) (listing definitions "[f]or purposes of this section"). Section 3733 deals with civil investigative demands pursuant to the FCA and defines "person" as "any natural person, partnership, corporation, association, or other legal entity, including any State or political subdivision of a State[.]" *Id.* § 3733(l)(4). While the FCA's liability section also includes a "Definitions" subsection, that subsection does not define the word "person." *See id* § 3729(b). Nevertheless, when determining whether the word "person" under Section 3733 applies to states and their agencies, the Supreme Court made it clear that the Court "do[es] not suggest that the[] features [of the FCA] directed only at natural persons cast doubt upon the courts' assumption that § 3729(a) extends to corporations." *Stevens*, 529 U.S. at 782, 787-88 (holding that the FCA's liability section does not apply to states or their agencies). "[T]hat is because the presumption with regard to corporations is . . . [that] they are presumptively *covered* by the term 'person[.]'" *Id.* at 782 (emphasis in original) (citing 1 U.S.C. § 1 (defining the word

"person" as "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals")).

Moreover, the Supreme Court has previously established that "*qui tam* relators have standing to prosecute FCA claims, even though the injury complained of in such suits is an injury to the United States government." *In re Hawker Beechcraft, Inc.*, 515 B.R. 416, 432 (Bankr. S.D.N.Y. 2014) (citing *Stevens*, 529 U.S. at 774). *Stevens* says so explicitly. 529 U.S. at 774 (concluding that "the United States' injury in fact suffices to confer standing on [the] respondent"). The idea is that "the *qui tam* relator stands in the shoes of the government, which is the real party in interest." *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154 (2d Cir. 1993). In other words, "the plaintiff sues on behalf of and in the name of the government and invokes the standing of the government resulting from the fraud injury." *Id.*

Basch argues that Relator lacks standing to bring FCA claims because it is a single-purpose empty shell corporation that was incorporated to serve as a litigation vehicle. (*See* Basch Mot. at 5-10.)[11] Relator responds that the identity of a relator does not change the standing analysis, and that "the Supreme Court and the Second Circuit have consistently held that the FCA confers standing on any relator operating in compliance with its terms." (Opp. at 2.) Basch and BIM counter that the cases cited by Relator do not suggest that an empty corporate shell created to conceal identities can pursue a *qui tam* claim within the FCA's confines. (Basch & BIM Joint Reply at 3.)

---

[11] Basch's and BIM's arguments regarding violation of the presumption of openness in judicial proceedings and proceeding anonymously are moot because Relator has now revealed its principal's identity. (*See* Basch Mot. at 10-16; *see also* BIM Mot. at 8-11; BIM Suppl. Mot. at 1-2; Basch & BIM Joint Reply at 3-5.)

Relator has the better of the argument. To begin with, the Government "is the real party in interest" here. *Kreindler*, 985 F.2d at 1154; *see also Stevens*, 529 U.S. at 773 (recognizing that "[t]he FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim"). And Relator has adequately alleged injury to the United States, New Jersey, and New York, which "suffices to confer standing" on Relator. *See Stevens*, 529 U.S. at 774 (explaining how "the long tradition of *qui tam* actions in England and the American Colonies" confirm that an injury in fact to the United States is enough for standing). Specifically, Relator has met its burden by alleging that "Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States and New York and New Jersey Medicaid[.]" (FAC ¶ 183.) The court addresses the sufficiency of these allegations under Rules 9(b) and 12(b)(6) below. For now, to establish standing, Relator simply needs to "invoke[] the standing of the government resulting from the fraud injury." *Kreindler*, 985 F.2d at 1154. Relator has successfully done so. *See Robinson*, 21 F.3d at 507 (acknowledging that "plaintiff need only make a *prima facie* showing of jurisdiction" and the court will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations").

If Congress wanted to bar shell corporations from bringing FCA claims as relators, it would have said so. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. . . . We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.") Because Section 3730 does not define the word "person," and "the context [does not] indicate[] otherwise, . . . the word[] 'person' . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." *See* 1 U.S.C. §

1. That, in turn, means that Relator is a person within the meaning of Section 3730 who "may bring a civil action for a violation of section 3729." *See* 31 U.S.C. § 3730(b)(1). Basch challenges Gordon's motives and Relator's lack of knowledge of the claims alleged in the complaint. (*See* Basch Mot. at 7-9.) But Basch is unable to advance any legal theory supported by a legal authority barring individuals from bringing *qui tam* actions while keeping their "identity secret from the public by hiding behind a corporation[.]" (*Id.* at 8.) His challenges are not relevant to this court's standing analysis. And even if Relator's anonymity was an issue before, that is no longer the case because the parties now know that Gordon is Relator's principal. (*See* FAC ¶ 10.) That revelation moots a lot of the arguments set forth in Basch's brief, which the court acknowledges Basch filed before Relator revealed Gordon's identity. (*See, e.g.*, Basch Mot. at 9 (arguing that "[k]nowing the name of the empty corporation that Relator's counsel formed specifically and solely for this litigation is of no help to Mr. Basch in trying to purposively analyze this matter").) In sum, the court concludes that Relator has standing to bring FCA claims on behalf of the government.

### 2.   Relator's Standing – Retaliation Claims

Relator lacks standing to bring retaliation claims on behalf of Gordon against Fresenius. The FCA provides a cause of action for employees who face retaliation for assisting with the prosecution of false claims actions. *See* 31 U.S.C. § 3730(h)(1) (stating, in relevant part, "[a]ny employee, contractor, or agent shall be entitled to . . . relief . . . if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against . . . because of lawful acts done . . . in furtherance of an action under this section"). Similarly, NJ CEPA protects employees from retaliatory action. *See* N.J. Stat. Ann. § 34:19-3 (prohibiting, in relevant part, retaliatory

action by an employer "against an employee because the employee . . . discloses, or threatens to disclose . . . an activity, policy or practice of the employer . . . that the employee reasonably believes: (1) is in violation of a law, or a rule or regulation . . .; or (2) is fraudulent or criminal"). Also relevant here, to bring a lawsuit, "the irreducible constitutional minimum of standing" requires a plaintiff to have suffered a "an 'injury in fact'—an invasion of a legally protected interest which is [] concrete and particularized" such that it "affect[s] the plaintiff in a personal and individual way." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 560 n.1 (1992). To that end, the long-standing Supreme Court precedent establishes that the plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties." *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party[.]"). In other words, "even when the plaintiff [] allege[s] injury sufficient to meet the 'case or controversy' requirement, th[e] Court [requires] that the plaintiff . . . assert his own legal rights and interests." *Id.*

Fresenius argues[12] that Relator does not have standing to bring retaliation claims against it because Relator "lacks standing to assert retaliation claims on behalf of" its principal, Gordon, "who is not a party to this case." (Fresenius Mot. at 22.)[13] In opposition,

---

[12] Basch acknowledges that Relator does not assert any retaliation claims against him but raises his own "arguments out of an abundance of caution." (Basch Mot. at 40 n.23, 40-41.) And because BIM initially filed a motion to dismiss Relator's TAC, which asserted retaliation claims against BIM as well, BIM's original motion raises arguments in favor of dismissal of retaliation claims as well. (*See* BIM Mot. at 22-23.) The court acknowledges that the FAC asserts retaliation claims against Fresenius only. (*See* FAC ¶¶ 232, 238.)

[13] While Fresenius also argues, as to all counts, that "prosecuting this case in the name of a shell entity to hide the identity and role of the individual

15

Relator claims that Fresenius's arguments have no merit "now that Gordon has disclosed his identity in the FCA" and Gordon "founded and owns 100% of YNKDY-2," making YNKDY-2 Gordon's alter ego. (Opp. at 48.)

In this case, Relator fails to allege any injury in fact to its concrete and particularized interest. *See Lujan*, 504 U.S. at 560 n.1 (elaborating that by "particularized," the Court "mean[s] that the injury must affect the plaintiff in a personal and individual way"). Instead, Relator only alleges injuries based on retaliation that directly affects Gordon only. (*See, e.g.*, FAC ¶ 233 (claiming that "[a]s a direct legal consequence of his wrongful firing, Gordon has lost, and shall continue to lose income, commissions, bonuses, and other valuable benefits"). Therefore, Relator attempts to do exactly what the Supreme Court has held that it cannot do: "rest[ing] [its] claim to relief on the legal rights or interests of [a] third part[y]," who is Gordon. *See Warth*, 422 U.S. at 499. To bring retaliation claims against Fresenius and Spectra, Relator needs to "assert his own legal rights and interests," not Gordon's. *See id.* And as the court further explains below, in addressing the FCA's "first-to-file" rule, Relator's argument that it is Gordon's alter ego is also meritless. Relator does not have standing to bring retaliation claims on behalf of Gordon.

Even if Relator had standing to bring retaliation claims against Fresenius, which it does not, Relator fails to plead that it was in an employment-type relationship with Fresenius. Both, the FCA and NJ CEPA require an employment-type relationship between the aggrieved party and the wrongdoer. *See Chorches*, 865 F.3d at 95 (explaining that Section 3730(h) "require[s] a plaintiff to show that (1) he engaged in activity protected under the statute,

---

. . . is fundamentally contrary to principles of fair notice and the presumption against anonymous pleading," (Fresenius Mot. at 22), as the court explains above, because Relator has now revealed Gordon's identity and added him as a co-Relator and plaintiff, this argument is moot.

(2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity"); *see also D'Annunzio v. Prudential Ins. Co. of Am.*, 192 N.J. 110, 119 (N.J. 2007) (recognizing that the New Jersey Legislature designed CEPA "to protect and thereby encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct"). Here, Relator is a shell corporation incorporated by Gordon to cloak his identity. Relator admits it. (*See* Opp. at 6; *see also id.* at 8 ("Defendants' prior insistence that Mr. Gordon corporation [sic] was created solely to bring this lawsuit and to conceal Mr. Gordon's identity is correct[.]").) Clearly, Relator itself has never worked for Fresenius or Spectra. Relator does not allege to the contrary. Relator only alleges that "Gordon was employed first by Shiel, then by BIM, and then bySpectra [sic]" and "made his dissatisfaction with Defendants' illegal conduct well known throughout the company." (FAC ¶¶ 224, 226.) Relator further alleges that within a month of Fresenius receiving a Civil Investigative Demand because a False Claims Act complaint had been filed against it, "Gordon was fired while taking two of his children on a college tour." (*Id.* ¶¶ 230-31.) None of these allegations show any employment-type relationship between Relator and the Defendants. Therefore, Relator's retaliation claims are subject to dismissal for failure to state a claim under Rule 12(b)(6) even if Relator had standing to litigate the retaliation claims. Regardless, this court has no subject-matter jurisdiction over the retaliation claims because Relator lacks such standing. And as the court further explains below, because Gordon cannot intervene in this action under the FCA's first-to-file rule, the court dismisses the retaliation claims in Counts VI and VII in their entirety.

### B. Personal Jurisdiction & Subject-Matter Jurisdiction – Shiel

This court lacks both personal jurisdiction over Shiel and subject-matter jurisdiction over the claims filed against Shiel. "[T]he Federal Rules of Civil Procedure differentiate between corporate existence and capacity." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 382-83 (2d Cir. 2021) (distinguishing unincorporated associations and partnerships with capacity to sue under Rule 17(b)(3)(A) from entities lacking legal existence, which cannot sue); *see also Roby v. Corp. of Lloyd's*, 796 F. Supp. 103, 110 (S.D.N.Y. 1992) ("Capacity to be sued and legal existence are separate and distinct concepts.") Legal existence is a jurisdictional issue. *See Bank of Am. Corp.*, 991 F.3d at 382-84. And a party lacking legal existence "lack[s] standing to sue" or be sued. *See id.* at 384; *see also Yaseen v. Bristol Police Dep't*, No. 23-CV-1042 (OAW), 2024 WL 4349053, at *3 (D. Conn. Sept. 30, 2024) ("Entities which have no legal existence cannot sue or be sued."). Furthermore, "[c]orporate existence and the capacity of a corporation to be sued are determined by the law of the state of incorporation." *Sevits v. McKiernan-Terry Corp. (N.J.)*, 264 F. Supp. 810, 811 (S.D.N.Y. 1966) (collecting cases); *see also V.E.C. Corp. of Del. v. Hilliard*, No. 10-CV-2542 (VB), 2011 WL 7101236, at *5 (S.D.N.Y. Dec. 13, 2011) (same); *Next Millenium Realty, LLC v. Adchem Corp.*, 690 F. App'x 710, 715 (2d Cir. 2017) (summary order) (citing *Marsh v. Rosenbloom*, 499 F.3d 165, 179 (2d Cir. 2007) (holding that a federal statute does not preempt state statutes that limit a party's capacity to be sued)).

As relevant here, under New York law, it is well settled "that a trade name . . . has no separate jural existence, and that it can neither sue nor be sued independently of its owner[.]" *Provosty v. Lydia E. Hall Hosp.*, 91 A.D.2d 658, 659 (2d Dep't 1982); *see also M.E. Aslett Corp. v. Crosfield Elecs., Inc.*, No. 86-CV-3549 (CSH), 1987 WL 7023, at *1 (S.D.N.Y. Feb. 17, 1987) (concluding that a "party named as defendant in th[e] action . . . is

nothing but a trade name which has no independent legal existence and which lacks the capacity to be sued under New York law"). It follows then that the court has no personal jurisdiction over a defendant that lacks legal existence. *See M.E. Aslett Corp.*, 1987 WL 7023, at *1 (acknowledging that the defendant, "[h]aving been served with papers naming its fictitious trade name[,] . . . could have moved to dismiss the action in state court for lack of personal jurisdiction"); *see also White v. Moylan*, 554 F. Supp. 2d 263, 266 (D. Conn. 2008) (concluding that "the court lacks personal jurisdiction over an entity that does not exist"). Similarly, "[b]ecause there can be no case or controversy between Plaintiff and imaginary defendants, and therefore no subject-matter jurisdiction, [the court] must dismiss Plaintiff's claims against" such defendants for lack of subject-matter jurisdiction. *Boyer Works USA, LLC v. Spin Master Prods.*, No. 21-CV-7468 (AKH), 2022 WL 1266090, at *3 (S.D.N.Y. Apr. 28, 2022).

BIM argues that the court must dismiss Shiel from this action for lack of personal jurisdiction because Shiel lacks the capacity to be sued. (*See* BIM Mot. at 11-14; *see also* BIM Suppl. Mot. at 2; Basch & BIM Joint Reply at 28-29.) Likewise, BIM also claims that the court lacks subject-matter jurisdiction over all the claims against Shiel because the FCA subjects to liability "any person," not "a non-legal entity such as a trade name." (*See* BIM Mot. at 13-14; *see also* Basch & BIM Joint Reply at 28-29.) Relator, seemingly conceding this point, does not make any arguments to the contrary. (*See generally* Opp.)

BIM has it right: this court has neither personal jurisdiction over Shiel, nor subject-matter jurisdiction over any of the claims filed against Shiel. First, Shiel has no legal existence. (*See* Nicole M. Barnard Aff. ("Barnard Aff.") (Dkt. 124-2) ¶ 4.) On November 20, 2013, Shiel changed its name to BIM, which is properly sued in this action as one of the Defendants. (*See id.*; *see also* Restated Certificate of Incorporation (Dkt. 124-3) at ECF p. 3; FAC ¶¶ 11-

12.) Moreover, BIM has since assumed the name "Shiel Medical Laboratory" as a trade name. (*See* Barnard Aff. ¶ 6; *see also* Certificate of Assumed Name (Dkt. 124-4) at ECF p. 2; FAC ¶ 11.) As a preliminary matter, the court applies New York law because Shiel, founded in 1962, was originally incorporated in New York. (*See* FAC ¶ 2; *see also id.* ¶ 11 ("Shiel Medical Laboratory was the assumed name of the co-defendant BIM Medical, Inc., a private corporation incorporated in the State of New York[.]").) *See also Sevits*, 264 F. Supp. at 811 ("Corporate existence and the capacity . . . to be sued are determined by the law of the state of incorporation."). Next, the court finds that because Shiel is simply a trade name for BIM, it "has no separate jural existence[.]" *Provosty*, 91 A.D.2d at 659. And for that reason, Shiel "lacks the capacity to be sued under New York law." *See M.E. Aslett Corp.*, 1987 WL 7023, at *1. Because Shiel lacks the capacity to be sued, this court has no personal jurisdiction over Shiel. *See Moylan*, 554 F. Supp. 2d at 266 ("[T]he court lacks personal jurisdiction over an entity that does not exist."). That also means "there can be no case or controversy between" Relator and Shiel, which is an "imaginary defendant[]," leaving this court with no subject-matter jurisdiction over Relator's claims against Shiel. *See Boyer Works USA, LLC*, 2022 WL 1266090, at *3.

Therefore, the court grants BIM's motion to dismiss Shiel from this action for lack of personal jurisdiction. The court also grants BIM's motion to dismiss all the claims asserted against Shiel for lack of subject-matter jurisdiction.[14]

## C.    First-to-File Rule

Next, the court concludes that Gordon is barred to intervene in this case under the FCA's "first-to-file" bar and dismisses him for failure to state a claim under Rule 12(b)(6). *See United States ex*

---

[14] While the court continues to make references to Shiel, such references are to Shiel as BIM's trade name, not as a proper party to this action.

*rel. Hayes v. Allstate Ins. Co.*, 853 F.3d 80, 85 (2d Cir. 2017) (joining "the D.C. Circuit in holding that the first-to-file rule is not jurisdictional and instead bears on the merits of whether a plaintiff has stated a claim"). As relevant here, the FCA creates a form of civil action known as *qui tam*[15] that imposes civil liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A) & (B); *see also Stevens*, 529 U.S. at 768-69 (explaining the FCA's statutory scheme). While the government can directly bring a claim against the alleged false claimant, "a private person (the relator) may [also] bring a *qui tam* civil action 'for the person and for the United States Government' against the alleged false claimant, 'in the name of the Government.'" *Stevens*, 529 U.S. at 769 (quoting 31 U.S.C. 3730(b)(1)). Depending on the outcome of the case, the statute rewards relators with monetary awards ranging between 15 to 30 percent of the proceeds of the action or settlement of the claim, as well as attorney's fees and costs. *See* 31 U.S.C. §§ 3730(d)(1)-(2). Despite allowing relators to initiate enforcement and collect partial damages, "[t]he government remains the real party in interest, . . . in the FCA suit." *Kreindler*, 985 F.2d at 1154.

Significantly, when a relator files a lawsuit pursuant to 31 U.S.C. § 3730(b)(1), "*no person other than the Government* may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5) (emphasis added). Colloquially known as "the first-to-file bar," this rule is designed to achieve the following three goals: first, "ensur[ing] that only one

---

[15] The phrase "is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Stevens*, 529 U.S. at 768 n.1 (citing 3 W. Blackstone, Commentaries *160).

relator shares in the Government's recovery"; second, "encourag[ing] potential relators to file their claims promptly," and third, limiting "the danger of parasitic exploitation of the public coffers." *United States ex rel. Mohajer v. Omnicare, Inc.*, 525 F. Supp. 3d 447, 458 (S.D.N.Y. 2021). The Supreme Court has explained that "when the term to intervene is used in reference to legal proceedings, it covers the right of one to interpose in, *or become a party to*, a proceeding already instituted." *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009) ("*Eisenstein*") (emphasis in original) (holding that the Government was not a party to an FCA action because it did not intervene under 31 U.S.C. § 3730(b)(2)). And "[t]he Court has further indicated that intervention is the *requisite* method for a nonparty to become a party to a lawsuit." *Id.* (emphasis added). That is because "hold[ing] otherwise would render the intervention provisions of the FCA superfluous." *Id.*

Although since the filing of its TAC Relator has added Gordon as a co-Relator to this action, Defendants contend that "Gordon is bound by his choice to have the corporate entity YNKDY-2 bring this case as the sole relator/plaintiff without seeking this Court's leave for himself to proceed anonymously." (Defs.' Combined Suppl. Mot. at 1-2 ("The addition of Gordon as a purported new relator/plaintiff via a Rule 15 amendment nearly eight years into this case . . . is barred as a matter of law.").) Defendants further argue that the FCA's "first-to-file" rule prohibits Relator from adding Gordon as a purported new named individual. (*Id.* at 4.) Relator disagrees, mainly by claiming that the first-to-file rule does not apply here because Gordon is not an intervening party within the meaning of the statute. (*See* Opp. at 5-13.) In response to Relator's arguments, Defendants contend that the Supreme Court's explanation of the meaning of the word "intervene" in *Eisenstein* is controlling here. (*See* Fresenius Reply at 6; Basch & BIM Joint Reply at 5-6.)

As an initial matter, the court acknowledges that it is bound by the Supreme Court's holding in *Eisenstein*. There, the Court interpreted the word "intervene" under 31 U.S.C. § 3730(b)(2) in determining whether a relator in a private FCA action had 30 or 60 days (number of days given to appeal when the United States or its officer or agency is a party) to file a notice of appeal. *See Eisenstein*, 556 U.S. at 937 (holding that the notice of appeal filed 54 days after entry of final judgment was untimely because the Government did not intervene, and the default 30-day appeal period was applicable). Because *Eisenstein* interpreted the meaning of the word "intervene" under 31 U.S.C. § 3730(b)(2), the Court's reasoning is equally applicable to this court's analysis of the meaning of the same word under 31 U.S.C. § 3730(b)(5). *See Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning."). And "[t]he interrelationship and close proximity" of paragraphs (b)(2) and (b)(5) further support this court's finding that the word "intervene" retains its meaning under paragraph (b)(5) that it has under paragraph (b)(2) as explained in *Eisenstein*. *See C.I.R. v. Lundy*, 516 U.S. 235, 249-50 (1996) (explaining that Congress gave the Court "no reason to believe that [it] meant the term 'claim' to mean one thing in [26 U.S.C.] § 6511 but to mean something else altogether in the very next section of the statute").

To be clear, Congress can indicate that a word has different meanings in different parts of the same act. Indeed, as the court explained above, the word "person" carries two different meanings in two different provisions of the FCA. For example, Section 3729 subjects a "person" to *qui tam* liability, without defining the word "person." *See* 31 U.S.C. §§ 3729(b)(1)-(4) (defining the terms "knowing" and "knowingly," "claim," "obligation," and "material" only). Meanwhile, Section 3733 allows the Attorney

General to issue civil investigative demands to any person meeting certain conditions. *See* 31 U.S.C. § 3733(a)(1). And here, the statute expressly defines the word "person," "[f]or purposes of this section," as, among other things, "any State or political subdivision of a State." *Id.* § 3733(l)(4). But the Supreme Court in *Stevens* explained that "[t]he presence of such a definitional provision in § 3733, together with the absence of such a provision from the definitional provisions contained in § 3729 . . . suggests that States are not 'persons' for purposes of *qui tam* liability under § 3729." *Stevens*, 529 U.S. at 784, 787-88 (holding that the FCA does not subject a State or its agency to liability in FCA actions). The same, however, cannot be said about the word "intervene," because the statute does not define it in any subsection. Relator initiated the instant action nine years ago. Now, Relator attempts to loop in its principal as a co-Relator. That it cannot do. Thus, reading 31 U.S.C. § 3730(b)(5) under the guidance of *Eisenstein*'s interpretation of the meaning of the word "intervene," the court concludes that the FCA's first-to-file rule prevents Relator from adding Gordon as a party to this action because "intervention is the *requisite* method for a nonparty to become a party to a lawsuit." *Eisenstein*, 556 U.S. at 933 (emphasis added). It follows then that this court must dismiss Gordon from this action for failure to state a claim under Rule 12(b)(6).

Relator takes multiple swings at *Eisenstein*'s holding that is directly instructive and binding on this court, but it strikes out. First, Relator argues that *Eisenstein* is inapposite here because it "ar[ose] from legal and factual issues operating well outside the ambit of the issue presented here." (Opp. at 9.) In doing so, Relator heavily relies on the Third Circuit's interpretation of *Eisenstein*. *See In re Plavix Mktg., Sales Pracs. and Prods. Liab. Litig. (No. II)*, 974 F.3d 228, 235 (3d Cir. 2020) (rejecting the appellees' *Eisenstein*-based arguments because "*Eisenstein* addressed a very different question"). The Third Circuit in *In re Plavix* concluded that *Eisenstein*'s holding did not "turn on the

meaning of 'intervene'" and reasoned that the Court's interpretation of the same was dictum. *Id.* ("The bar's plain text, not a stray dictum about that text, resolves its meaning."). But dictum "generally refers to an observation which appears in the opinion of a court which was unnecessary to the disposition of the case before it." *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 508 (2d Cir. 1996). The Supreme Court's interpretation of the meaning of the word "intervene" in *Eisenstein* is necessary to its "hold[ing] that when the United States has declined to intervene in a privately initiated FCA action, it is not a 'party' to the litigation for purposes of either § 2107 or Federal Rule of Appellate Procedure 4." *See Eisenstein,* 556 U.S. at 937. Put differently, had the Court not defined the word "intervene" within the relevant subsection of the FCA or deleted the sections of its opinion discussing the same, its holding could not stand. *See Hormel Foods,* 73 F.3d at 508 (reasoning that dictum "is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding"). And *Eisenstein* certainly considered both paragraphs (b)(2) and (b)(5) when determining the meaning of the word "intervene" under Section 3730 of the FCA. *See Eisenstein,* 556 U.S. at 933 ("To hold otherwise would render the intervention *provisions* of the FCA superfluous." (emphasis added)). Thus, *Eisenstein* controls here. *Id.* (indicating "that intervention is the *requisite* method for a nonparty to become a party to a lawsuit.")[16]

---

[16] It is also worth noting that *In re Plavix* begins its analysis by discussing "three ways for nonparties with interests relevant to a suit to become parties to a suit" in "normal civil litigation," 974 F.3d at 233, completely ignoring that the FCA *qui tam* actions are anything but normal. *See State Farm Fire and Cas. Co. v. United States ex rel. Rigsby,* 580 U.S. 26, 29 (2016) ("Almost unique to the FCA are its *qui tam* enforcement provisions, which allow a private party known as a 'relator' to bring an FCA action on behalf of the Government."). In any case, this court is not bound by the Third Circuit's ruling.

Similarly, Relator directs the court's attention to another out-of-circuit decision, the Tenth Circuit's ruling in *United States ex rel. Precision Co. v. Koch Indus.* ("*Precision*"), which held that the first-to-file bar applies only to interventions under Rule 24, "prohibit[ing] parties unrelated to the original plaintiff from joining the suit to assert a claim based on the same facts relied upon by the original plaintiff." 31 F.3d 1015, 1017-18 (10th Cir. 1994). (*See* Opp. at 10-11.) But in addition to being an out-of-circuit authority that is not binding on this court, *Precision* also predates *Eisenstein*. In fact, in one of its post-*Eisenstein* opinions, the Tenth Circuit "question[ed] whether [its] holding in *Precision* remains good law in light of the Supreme Court's subsequent decision in *Eisenstein*." *See United States ex rel. Little v. Triumph Gear Sys., Inc.*, 870 F.3d 1242, 1247 n.6 (10th Cir. 2017).

Second, Relator cites various cases discussing parent-subsidiary relationships between corporate entities to argue that because Gordon created YNKDY-2 "solely to bring this lawsuit and to conceal [his] identity," it means that he "may now identify himself and proceed." (Opp. at 8.) Relator is only partially correct. Gordon may now identify himself. But he may not proceed. Defendants correctly point out, (*see* Defs.' Combined Suppl. Mot. at 2), and Relator acknowledges, (Opp. at 6), that "[a] corporation is an entity that is created by law and endowed with a separate and distinct existence from that of its owners," *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988) (recognizing that "there is a presumption of separateness between a corporation and its owners, . . . which is entitled to substantial weight"). California, which is where Relator is incorporated, (*see* FAC ¶ 10), also recognizes that "[o]rdinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations," *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 538 (Cal. App. 5th Dist. 2000).

Under the alter-ego doctrine[17] adopted by California courts, the presumption of separateness can be rebutted, and the corporate veil can be pierced, "where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation." *Id.* The purpose of this doctrine is to "prevent[] individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds." *Id.*

But a party "cannot use the alter ego doctrine to 'pierce the corporate veil' of a separate corporation which it claims it set up to conceal its property from the federal government and to circumvent the laws of the state concerning duties of corporate directors." *Communist Party v. 522 Valencia, Inc.*, 35 Cal. App. 4th 980, 995 (Cal. App. 1st Dist. 1995) (clarifying that the alter ego doctrine "is not designed to unite two separate entities . . . for the benefit of the one claiming to control the other"); *see also Coleman v. Estes Express Lines, Inc.*, 730 F. Supp. 2d 1141, 1153 (C.D. Cal. 2010) ("Generally, the corporate veil can be pierced only by an adversary of the corporation, not by the corporation itself for its own benefit."). California law bars precisely the kind of conduct—simultaneously using the alter ego doctrine as a sword and a shield—in which Relator attempts to engage. Relator's arguments that the alter ego doctrine allows Gordon to hide his identity to circumvent the FCA's first-to-file rule is explicitly

---

[17] In determining whether the corporate form will be disregarded and the corporate veil pierced, the law of the state of incorporation applies. *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("The law of the state of incorporation determines when the corporate form will be disregarded."). Accordingly, because Relator is a California corporation, the court applies California law to determine whether corporate veil can be pierced. *See Ramirez v. Chip Masters, Inc.*, No. 11-CV-5772 (WFK) (MDG), 2014 WL 1248043, at *4 (E.D.N.Y. Mar. 25, 2014) (applying California law to determine whether the corporate veil of a California corporation can be pierced).

barred by the law of the state in which Relator was incorporated. *See 522 Valencia*, 35 Cal. App. 4th at 994-96 (holding that the Communist Party could not use the alter ego doctrine to pierce the corporate veil for its own benefit). Therefore, this court cannot ignore Relator's "separate and distinct existence from that of [Gordon]." *See Am. Protein Corp.*, 844 F.2d at 60; *see also 522 Valencia*, 35 Cal. App. 4th at 993-94 (collecting cases to explain that "persons who themselves control a corporation, . . . who have dealt with and treated the corporation as a separate entity, or who have otherwise by their actions expressly or impliedly recognized its corporate existence, may be estopped to deny the corporation's separate legal existence").

Third, Relator invokes Rule 17(a)(3), claiming that it "expressly *forbids* dismissal at this stage of the litigation so long as the pseudonymous plaintiff amends the complaint to include its correct name in a timely manner following objection." (Opp. at 4 (emphasis in original).); *see also* Fed. R. Civ. P. 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."). But Defendants correctly point out that they do not move to dismiss Gordon from this case under Rule 17(a)(3). (*See* Fresenius Reply at 2-3; *see also* Basch & BIM Joint Reply at 7-8.) Nor does Relator attempt to add Gordon as a co-Relator under the same rule. Rather, Relator "mo[ved] for leave to file its Fourth Amended Complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure." (*See* Relator's Letter Requesting Pre-Mot. Conf. Dated 11/30/2023 (Dkt. 95) at 1.) As the court explains above, the Second Circuit has made it clear that "the FCA's first-to-file rule bears only on whether a *qui tam* plaintiff has properly stated a claim." *Hayes*, 853 F.3d at 86 (reasoning that "a district court does not lack subject matter jurisdiction over an action that may be barred on the merits by the first-to-file rule"). As such, this court's dismissal of

Gordon is not based on lack of jurisdiction or Rule 17(a)(3); it is based on the merits, namely, Gordon's failure to state a claim upon which relief can be granted. The court also notes that even if Rule 17(a)(3) applied here, which it does not, it would not apply to Gordon. That is because the "real party in interest" in FCA *qui tam* actions is the government, not Relators or purported Relators. *See Kreindler*, 985 F.2d at 1154 ("The government remains the real party in interest, . . . in the FCA suit.").

Lastly, Relator's point that because Relator and Gordon are closely related, "their recovery, if they prevail, will of course be a unitary amount to be distributed between Gordo[n] and his company as he sees fit," (Opp. at 10), cuts against, not in favor of, allowing Gordon to co-litigate this case as a second relator. Gordon chose to litigate this case by establishing a shell corporation. He does not get to insert himself into this action in violation of the FCA's first-to-file rule, especially when he can clearly collect whatever amount YNKDY-2 can recover. Therefore, the court dismisses Gordon from this action for failure to state a claim under Rule 12(b)(6). Furthermore, as the court explained above, because Gordon is no longer a party to this action and Relator has no standing to bring retaliation claims on behalf of Gordon against Fresenius, the court dismisses the retaliation claims in Counts VI and VII as well.

### D. FCA Claims

Relator fails to adequately allege false claims pursuant to the FCA, NYFCA, and NJFCA. The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).[18] It also allows for a relator to bring a *qui tam*

---

[18] Because "[t]he NJFCA and NYFCA mirror the FCA and require the same showings[,]" for the sake of efficiency, this court limits its analysis to the federal FCA statute. *See United States v. Andover Subacute & Rehab Ctr.*

action against those who "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B). To state a claim under the aforementioned provisions of the FCA, a Relator "must show that defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury."[19] *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001), *abrogated in part on other grounds by Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016). Furthermore, Congress amended the FCA in 2009, adding a "materiality" requirement to FCA claims brought under 31 U.S.C. § 3729(a)(1)(B). *See United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 86 n.5 (2d Cir. 2012) (explaining that the amendment applies prospectively); *see also* 31 U.S.C. § 3729(b)(4) (defining "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property"). Where the relator fails to state an FCA claim "the state claims should generally be

---

*Servs. One, Inc.*, No. 12-CV-3319 (SDW) (MAH), 2020 WL 7640535, at *4 n.9 (D.N.J. Dec. 22, 2020); *see also Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (summary order) ("[B]ecause the NYFCA follows the federal False Claims Act, New York courts look toward federal law when interpreting the New York act."); *Scibetta v. AcclaiMed Healthcare*, No. 16-CV-2385 (PGS) (DEA), 2021 WL 5450296, at *6 (D.N.J. Nov. 22, 2021) (acknowledging that "the New Jersey False Claims Act essentially mirrors the Federal False Claims Act with respect to the applicable sections in the instant case" while highlighting "[o]ne notable difference between the [two] is that the New Jersey law does not contain a materiality requirement"); *United States ex rel. Charte v. Am. Tutor, Inc.*, 934 F.3d 346, 351 n.22 (3d Cir. 2019) (acknowledging that the relator "asserted claims under both the federal False Claim[s] Act and the New Jersey False Claims Act" but focusing on the federal FCA only "[f]or the sake of brevity").

[19] Defendants do not dispute the second—"to the United States government"—and the fifth—"seeking payment from the federal treasury"—elements of Relator's claims.

dismissed as well." *United States ex rel. Gallian v. AmerisourceBergen Corp.*, No. 16-CV-2458 (ENV) (LB), 2022 WL 20611664, at *8 (E.D.N.Y. Dec. 22, 2022) (declining to exercise supplemental jurisdiction over the remaining state law claims).

To plead an FCA claim under Section 3729(a)(1), a relator must allege with particularity the underlying fraudulent scheme, as well as the actual submission of false claims. *Chorches*, 865 F.3d at 83 ("Fraud under the FCA has two components: the defendant must submit or cause the submission of a claim for payment to the government, and the claim for payment must itself be false or fraudulent."). Relator cannot "satisfy the heightened pleading standard" of Rule 9(b) where "he does not provide the Court with any specifics about any alleged false claim." *Ameti ex rel. United States v. Sikorsky Aircraft Corp.*, No. 14-CV-1223, 2017 WL 2636037, at *6 (D. Conn. June 19, 2017) (noting that the relator did not plead, among other things, "the specific contract involved, [or] the specific date on which a violation occurred," and failed to "identify any particular false claim submitted to the Government, who made the false claim or when the false claim was allegedly made"); *see also Antifun Ltd. v. Wayne Indus. LLC*, 616 F. Supp. 3d 291, 313 (S.D.N.Y. 2022) (citing cases and explaining that broad "time range" spanning multiple months or more does not satisfy Rule 9(b)).

"In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *Pfizer*, 2009 WL 1456582, at *4; *see also United States v. Bornstein*, 423 U.S. 303, 312 (1976) (noting that the FCA "does not penalize [one defendant] for what [another defendant] did"); *United States ex rel. Corp. Compliance Assocs. v. N.Y. Soc'y for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for Special Surgery*, No. 7-CV-292 (PKC), 2014 WL 3905742, at *19 (S.D.N.Y. Aug. 7, 2014) ("Because Rule 9(b) requires that a defendant receive fair notice of the fraud claim, a plaintiff alleging a claim

sounding in fraud against multiple defendants under Rule 9(b) must plead with particularity by setting forth *separately* the acts complained of by *each defendant*." (emphases in original)); *United States v. Canzoneri*, No. 20-CV-505 (LJV), 2023 WL 4082376, at *6 (W.D.N.Y. June 20, 2023) (describing medical providers as "the who," illegal kickbacks as "the what," time periods as "[the] when," and locations as "the where" of the fraudulent scheme). It follows then that "Rule 9(b) is not satisfied by a complaint in which defendants are clumped together in vague allegations." *Ritani, LLC v. Aghjayan*, 970 F. Supp. 2d 232, 250-52 (S.D.N.Y. 2013) (dismissing the complaint in part because it "conflates the acts of [the defendants], such that . . . particular acts with which they are charged cannot be determined").

### 1.    Applicable Pleading Standard

As a threshold matter, the court finds that the heightened Rule 9(b) standard—as opposed to a relaxed pleading standard—controls this court's analysis of the FCA claims. Generally, the Second Circuit "recognize[s] and rigorously enforce[s] the[] salutary purposes of Rule 9(b)." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25-26 (2d Cir. 2016) (identifying the purposes of Rule 9(b) as "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit"). "But the adequacy of particularized allegations under Rule 9(b) is case- and context-specific." *Chorches*, 865 F.3d at 81. Thus, where "the relator makes plausible allegations . . . that lead to a strong inference that *specific claims* were indeed submitted," courts within the Second Circuit relax the Rule 9(b) standard after determining "that information about the details of the claims submitted are peculiarly within the opposing party's knowledge." *Id.* at 93 (emphasis added); *but see United States ex rel. NPT Assocs. v. Lab'y Corp. of*

*Am. Holdings*, No. 7-CV-5696 (ALC), 2022 WL 3718265, at *5 (S.D.N.Y. Aug. 29, 2022) (refusing to relax the Rule 9(b) standard because the relator failed to "adequately allege[] that the particulars of the claims are exclusively held by" the defendant).

It logically follows then that "[d]espite the generally rigid requirement[s]" of Rule 9(b), "allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) (citing cases and recognizing that "[t]his exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations"); *see also Chorches*, 865 F.3d at 81-82 ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject."). Even then, the complaint must "adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Wexner*, 902 F.2d at 172. Otherwise, "those who *can* identify examples of actual claims *must* do so at the pleading stage." *Chorches*, 865 F.3d at 86 (emphases in original).

Here, Relator's complaint is completely devoid of any allegations that the bills or invoices Defendants submitted to the government are peculiarly within their knowledge and control. To the contrary, the FAC explicitly concedes that Gordon "was responsible for negotiating the[] discounts and therefore had personal knowledge of the[] kickbacks for the last twenty years." (FAC ¶ 6; *see also id.* ¶ 158 (alleging that Gordon "had personal knowledge of the[] illegal inducements . . . because [Gordon] was responsible for getting the nursing home contracts signed, including the Part A discounts in exchange for exclusivity").) By

admitting that Gordon has personal knowledge of "th[e] information about the details of" kickbacks, Relator concedes that claims premised on such information cannot be "peculiarly within the opposing party's knowledge." *See Chorches*, 865 F.3d at 93; *see also NPT Assocs.*, 2022 WL 3718265, at *5 (finding that the relator failed to "adequately allege[] that the particulars of the claims are exclusively held by" the defendant).

As to the remaining false claims based on allegedly false diagnostic codes and improper physician self-referrals, Relator pleads that Gordon "does not have personal knowledge of claims processing as he was in sales." (FAC ¶ 10.) However, the rest of the same paragraph makes further concessions that "*[w]ith only the rarest of exceptions*, [Gordon] did not have access to the actual claim submissions or (*except for the endpoint of a claim rejection*) any of the technical details of paper or electronic claim submissions[.]" (*Id.* (emphases added).) Even ignoring Relator's concessions, alleging that Gordon did not have access to claims is still not enough for relaxing Rule 9(b)'s strict pleadings standard. Relator must still adequately "alleg[e] that the missing details are uniquely within [the defendants'] knowledge and control." *NPT Assocs.*, 2022 WL 3718265, at *5 (explaining that an assertion that the Defendant "could locate the relevant claims by using the information provided by [the relator]" does not suffice). Relator fails to do so. Relator's attempt to minimize Gordon's role within "a large company with over 500 employees" in its opposition, (*see* Opp. at 37), ignores Relator's own allegation that "Gordon held a senior position" within the company and "ha[d] direct and personal knowledge of the matters alleged" in the FAC, (FAC ¶ 10; *see also id.* ¶ 86 (alleging that Gordon "has seen multiple Explanations of Medicare Benefit forms (EOMBs) that show that claims were denied when initially submitted").)

Therefore, because Relator "*can* identify examples of actual claims," Relator "*must* do so at the pleading stage." *Chorches*, 865

F.3d at 86 (emphases in original). Concluding that Rule 9(b)'s strict pleading standards apply, the court now turns to each contested element of the FCA claims at issue in this action.

### 2. Defendants' Claims

Relator fails to allege the submission of a single false claim to the government by any of the Defendants. As relevant here, the FCA defines a "claim" as "any request or demand . . . for money or property" that is "presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A)(i); *see also Chorches*, 865 F.3d at 81 (same). "The submission of a false claim is the *sine qua non* of a[n] FCA violation." *United States ex rel. Duhaine v. Apple Health Care Inc.*, No. 19-CV-963 (KAD), 2022 WL 3226631, at *6 (D. Conn. Aug. 10, 2022); *see also United States ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 253 (S.D.N.Y. 2014) (recognizing that "the submission of a claim is an essential element of causes of action under subsections (a)(1)(A) and (a)(1)(B)"). Where a party submits documentation "one step removed from a request or demand for money—an offer made in the hope of acceptance[,]" such documentation does not constitute a claim within the meaning of the statute. *See United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 335 (S.D.N.Y. 2004); *see also United States ex rel. Finney v. Nextwave Telecom, Inc.*, 337 B.R. 479, 488 (S.D.N.Y. 2006) ("Without a demand for payment or reimbursement *from* the government, there simply is no 'claim' under the FCA.") (emphasis in original).

In this case, Relator fails to identify a single claim submitted to the government. The FAC seemingly includes "a sample of both inpatient (SNF) and outpatient claims for Medicare patients." (*See* FAC ¶ 98.) However, the complaint mischaracterizes what it later admits to be "**REQUISITION SLIPS WITH NO AUTHORIZATION.**" (*Id.* (emphasis in original).) Requisition slips are not "request[s] or demand[s] . . . for money or property" that is "presented to an officer, employee, or agent of the United States." *Id.*

§ 3729(b)(2)(A)(i). The FAC itself accurately describes them as "condition precedent to claims being submitted to Medicare and Medicaid." (FAC ¶ 191.) But a slip that may ultimately influence a claim to be submitted to the government is "one step removed from a request or demand for money[.]" *See Gabelli*, 345 F. Supp. 2d at 335 (reasoning that "it does not follow that 'claims' cover false certifications made in connection with mere *bids* presented to the FCC," because "[a] bid, by its very nature, does not request or demand monetary compensation" (emphasis in original)). Therefore, because the requisition slips themselves do not "demand for payment or reimbursement *from* the government, there simply is no 'claim' under the FCA" here. *See Finney*, 337 B.R. at 488 (emphasis in original).

Because Relator fails to allege that any of the Defendants submitted a false claim to the government—the *sine qua non* of an FCA claim—the court dismisses the FCA claims and their state counterparts as to each Defendant on that independent basis.

### 3. Falsity

Additionally, Relator also fails to allege with particularity the falsity of the diagnosis code sheets. Likewise, the FAC does not adequately plead improper kickback schemes or physician self-referrals that allegedly formed the basis of certain false claims submitted to the government. To plead an FCA claim under Section 3729(a)(1), a relator must allege with particularity the underlying fraudulent scheme. *See Chorches*, 865 F.3d at 83-84 (holding that the relator sufficiently pleaded "that records were in fact falsified"). To that end, where "FCA claims [are] premised on violations" of the AKS, a relator "must plead both the FCA violation and the underlying kickback scheme in compliance with Rule 9(b)." *Novartis Pharms. Corp.*, 2020 WL 1436706, at *3 (citing cases). The AKS, as relevant here, prohibits any party from "pay[ing] any remuneration . . . to any person to induce such person to refer an individual to a person for the furnishing or

36

arranging for the furnishing of any item or service for which payment may be made in whole or in part" through Medicare or Medicaid. 42 U.S.C. § 1320a-7b(b)(2)(A). This conduct is punishable by up to ten years in prison and fines of up to $100,000. *See id.* § 1320a-7b(b)(2). And a violation of the AKS "constitutes a false or fraudulent claim" for FCA purposes. *Id.* § 1320a-7b(g). "[W]here an FCA claim is based on a violation of the AKS, the AKS scienter requirement must also be satisfied." *United States ex rel. Hart v. McKesson Corp.*, 602 F. Supp. 3d 575, 592 (S.D.N.Y. 2022); *see also* 42 U.S.C. § 1320a-7b(b)(2) (requiring knowledge and willfulness); *id.* § 1320a-7b(h) ("With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section."); *United States v. Novartis AG*, No. 4-CV-4265 (NGG) (RLM), 2011 WL 13234720, at *9 (E.D.N.Y. Feb. 8, 2011) (recognizing that "[t]he plaintiff must also meet the AKS's willfulness requirement by alleging that the defendant acted with the intent to do something that the law forbids," rather than "alleg[ing] that the defendant had actual knowledge of the statute").

Like the FCA claims based on AKS violations, those premised on the Stark Law violations must also plead the underlying "fraudulent scheme of self-referrals." *United States ex rel. Levine v. Vascular Access Ctrs. L.P.*, No. 12-CV-5103 (LGS), 2020 WL 5534670, at *5 (S.D.N.Y. Sept. 15, 2020). The Stark Law bars an entity from submitting claims to Medicare for twelve categories of "designated health services," including "clinical laboratory services," *see* 42 U.S.C. § 1395nn(h)(6)(A), if such services were referred to the entity by a physician (or such physician's immediate family member) with whom the entity "ha[d] a financial relationship" that does not fall into any of the statutory exceptions, *id.* § 1395nn(a); *see also* 42 C.F.R. § 411.351 (defining "clinical laboratory services"). Save for certain exceptions set forth in 42 U.S.C. §§ 1395nn(b)-(e) that are not relevant here, the Stark Law defines financial relationship as "an ownership or

investment interest in the entity, or . . . a compensation agreement . . . between the physician (or an immediate family member of such physician) and the entity." *Id.* § 1395nn(a)(2). Thus, "by its plain terms, the statute prohibits only referrals involving physicians (or their immediate family members)." *United States v. Maimonides Med. Ctr.*, No. 19-CV-1039 (RPK) (SJB), 2023 WL 6292538, at *5 (E.D.N.Y. Sept. 27, 2023) (finding that the relator failed to plausibly allege a violation of the Stark Law "[b]ecause the defendants are businesses—not physicians").

The court addresses each theory of alleged underlying fraudulent scheme in turn below.

### a. *Reasonable and Necessary Tests – Diagnostic Codes*

Relator fails to allege with particularity the falsity of the diagnostic codes that allegedly formed the basis of certain claims Defendants submitted to the government. As relevant here, "no payment may be made under part A or part B [of Medicare] for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]" 42 U.S.C. § 1395y(a)(1)(A). Moreover, in order to adequately allege the falsity of the diagnostic codes and test orders, the complaint must contain allegations that "any claim for payment . . . was false" by "includ[ing] the specifics of" such claims. *Ladas*, 824 F.3d at 27 (upholding the district court's conclusion that the complaint failed to meet Rule 9(b)'s standards of particularity).

Here, the FAC still fails to differentiate between the Defendants, making it impossible for them to "receive fair notice of the fraud claim" against them. *See N.Y. Soc'y*, 2014 WL 3905742, at *19 (explaining that "a plaintiff alleging a claim sounding in fraud against multiple defendants under Rule 9(b) must plead with particularity by setting forth *separately* the acts complained by

*each defendant*" (emphases in original)). For instance, Relator alleges that Gordon "has seen multiple . . . EOMBs . . . that show that claims were denied when initially submitted, but when ICD codes were later added, . . . the claims were paid upon resubmission." (FAC ¶ 86.) This allegation does not identify with particularity the Defendants *who* submitted the claims, *when* they submitted the claims, or *what* they included in those claims. Such conclusory allegations that fail to "set forth the who, what, when, where and how of the alleged fraud" will not do. *See Pfizer*, 2009 WL 1456582, at *4. Even where the FAC identifies a particular Defendant responsible for the alleged wrong, (*see* FAC ¶ 90 (pleading that "Shiel taught its account representatives to insert codes themselves")), it nevertheless falls short of identifying the timeframe or location of the relevant events, *see Canzoneri*, 2023 WL 4082376, at *6 (recognizing that time periods are "the when," and locations are "the where" of the fraudulent scheme). Likewise, where the complaint alleges that Defendant Basch was pressuring Gordon "to make sure he was adding codes," (FAC ¶ 92), it does not explain why the codes were false or whether SNFs or physicians had not reviewed or authorized them based on the patient's condition. Relator expects the court to accept its speculation that the codes must have been false because Relator states so in a conclusory fashion; however, that is not the standard. The FAC must still "include the specifics of" its claims. *See Ladas*, 824 F.3d at 27.

Lastly, continuing its general theme of grouping Defendants together, the FAC alleges, without specifying any timeline or location, that "Shiel and Basch (and later BIM) . . . wanted billable ICD9/10 codes inserted whether the doctors had authorized them or not." (FAC ¶ 95.) Once again, Relator attempts to "clump[] together in vague allegations" the Defendants, thus "conflat[ing] the[ir] acts . . . such that . . . particular acts with which they are charged cannot be determined." *See Aghjayan*, 970 F. Supp. 2d at 250-52. As the court states above, this is not

sufficient under Rule 9(b) because the FCA "does not penalize [one defendant] for what [another defendant] did." *See Bornstein*, 423 U.S. at 312.

Therefore, Relator fails to adequately allege the falsity of diagnostic codes subject to Rule 9(b)'s heightened pleading standard.

### b.  *Kickbacks – Gifts, Parties & Discounts*

Next, the FAC also fails to allege underlying violations of the AKS. First, Relator's allegations repeat the same kind of group allegations that make it impossible for Defendants to "receive fair notice of the fraud claim." *See N.Y. Soc'y*, 2014 WL 3905742, at *19. (*See* FAC ¶ 129 (referring to Defendants in a single paragraph as "Shiel and subsequently BIM and Fresenius").) Although the FAC identifies the names of physicians "that received computers or tablets" as gifts, (*see* FAC ¶ 129), it does not state with specificity the dates or locations of these transactions, *see Canzoneri*, 2023 WL 4082376, at *6 (emphasizing the importance of pleading "the when" and "the where" of the fraudulent scheme pursuant to Ruel 9(b)); *see also Pfizer*, 2009 WL 1456582, at *4 (reminding that "the who, what, when, where and how of the alleged fraud" are essential to a successful pleading under Rule 9(b)). The FAC's allegations regarding entertainment and parties are similarly lacking. Again, Relator alleges that "Shiel would provide expensive tickets to Broadway shows or sporting events, lavish dinners and wine and even provide holiday parties and dinners for provider and provider groups who were large utilizers of Shiel's lab services." (FAC ¶ 147.) But these allegations do not identify the recipients of the services. While the very next sentence of the complaint identifies Bergen Gastro as a recipient of "an average of $14,785 per year in incentives such as entertainment," (*id.*), it again lacks in specificity for it fails to identify the time period and the details of entertainment that Relator alleges Bergen Gastro received.

The FAC's descriptions of other perks Shiel allegedly provided between 2011-2014, (*see id.*), and 2010-2014, (*see id.* ¶ 148), are also insufficient because broad time ranges do not satisfy Rule 9(b)'s specificity requirement, *see Antifun Ltd.*, 616 F. Supp. 3d at 313 (noting that broad "time range" spanning multiple months or more is not particularized)). Lastly, Relator's allegations of kickbacks based on discounts, similarly fail to satisfy Rule 9(b)'s strict pleading standard because while the FAC identifies the nursing homes receiving discounts, (*see* FAC ¶¶ 155-56), it does not provide a specific timeline of remunerations provided to them and makes generic references to discounts without specifying the dollar amounts. Such generalized allegations are not sufficient "under the FCA" that is "subject to the particularity requirement" of Rule 9(b). *See Strock*, 982 F.3d at 66.

Relator also does not plead any facts alleging willfulness under the AKS. (*See generally* FAC.) Nor does Relator address the lack of such allegations in its opposition, seemingly abandoning its FCA claims based on the AKS violations. (*See* Opp.; *see also* Basch & BIM Joint Reply at 26.) Relator's failure to plead facts establishing "the AKS's willfulness requirement by alleging that the defendant[s] acted with the intent to do something that the law forbids" constitutes an independent basis for this court to dismiss the claims based on the AKS violations. *See Novartis AG*, 2011 WL 13234720, at *9.

### c.   *Physician Self-Referrals*

Similarly, Relator's allegations with respect to the allegedly fraudulent physician self-referral scheme fare no better. First, Relator fails to allege the specifics of referrals for clinical laboratory services, such as the names of the patients or physicians that made such referrals. Next, the complaint pleads no facts describing the nature of the financial relationship between the physicians and any of the Defendants, to explain whether any of the physicians had "an ownership or investment interest in" one

of the Defendant entities, or "a compensation agreement" with any of them. *See* 42 U.S.C. § 1395nn(a)(2). Lastly, the nursing homes the FAC identifies are not covered by the statute because "[b]y its plain terms, the statute prohibits only referrals involving physicians (or their immediate family members)," not businesses. *See Maimonides*, 2023 WL 6292538, at *5. (*See also* FAC ¶¶ 155-56.)

Thus, Relator fails to adequately allege a single underlying fraudulent scheme in support of its FCA claims.

### 4. Knowledge

The court also concludes that Relator's complaint does not plead facts demonstrating Defendants' knowledge of false claims. "[T]he FCA has a liberal scienter requirement," *Gold*, 68 F.3d at 1477, in that it does not require "proof of specific intent to defraud," 31 U.S.C. § 3729(b)(1)(B). Rather, it provides three alternative definitions for the terms "knowing" and "knowingly": a person with "actual knowledge," "act[ing] in deliberate ignorance of the truth or falsity," or "act[ing] in reckless disregard of the truth or falsity" of the relevant information. *Id.* §§ 3729(b)(1)(A)(i)-(iii). Put differently, "the government must allege that the defendants 'knowingly violated a requirement that the defendants know is material to the Government's payment decision.'" *Strock*, 982 F.3d at 66 (quoting *Universal Health Servs., Inc.*, 579 U.S. at 181, 192 (describing the FCA's scienter requirement as "rigorous")). And "[P]laintiffs, including the government, still must plead the factual basis which gives rise to a strong inference of fraudulent intent." *Id.* at 66. "The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91

Case 1:16-cv-01090-NGG-TAM    Document 136    Filed 03/29/25    Page 43 of 48 PageID #: 2261

(2d Cir. 2006). And "[t]he complaint must plead facts supporting scienter as to each defendant." *Strock*, 982 F.3d at 66.

Other than pleading certain conclusory statements regarding Defendants' knowledge as a group, the FAC is completely devoid of any allegations of scienter. For example, Relator alleges that "Defendants knew that compliance with the Stark Law and Anti-Kickback Statute was a condition of payment by Medicare." (FAC ¶ 174.) This, however, only alleges Defendants' knowledge of the compliance requirement. It does not plausibly "alleg[e] facts to show that defendants had both motive and opportunity to commit fraud, or . . . alleg[e] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *See Lerner*, 459 F.3d at 290-91. Moreover, these allegations do not "plead facts supporting scienter as to each defendant," instead referring to them as a group. *See Strock*, 982 F.3d at 66. Relator's remaining scienter allegations are no different—they only make conclusory allegations that Defendants acted knowingly without setting forth any specific facts supporting such allegations. (*See, e.g.*, FAC ¶ 79 ("Defendants knowingly submitted and caused to be submitted false claims[.]"); *id.* ¶ 175 ("Defendants knowingly compensated physicians and skilled nursing facilities in exchange for referrals, in violations of the Stark Law and Anti-Kickback Statute.").) Relator's failure to plead facts supporting requisite knowledge of its FCA claims constitutes an independent basis for this court to dismiss the FCA claims and their state analogs.

### 5.  Reverse False Claims

The court further finds that Relator fails to state a reverse false claim in Count III of the FAC and abandons this claim. Subsection 3729(a)(1)(G) authorizes reverse false claims, imposing liability on any person who, in relevant part, "knowingly makes, uses, or causes to be made or used, a false record or statement material

to an obligation to pay or transmit money or property to the Government[.]" *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 119 (2d Cir. 2021) (explaining that it "is referred to as the reverse false claims provision because it covers claims of money *owed* to the government, rather than payments *made* by the government" (emphasis in original)). To that end, to state a reverse false claim under the FCA, "a relator must show: (1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government—a duty to pay money or property." *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 292 (E.D.N.Y. 2016). And similar to FCA claims brought pursuant to 31 U.S.C. §§ 3729(a)(1)(A) & (B), a reverse false claim also requires, among other elements, falsity and knowledge. *See* 31 U.S.C. § 3729(a)(1)(G); *see also Foreman*, 19 F.4th at 119 (quoting the language of the provision).

Furthermore, "reverse false claims mirror[ing] . . . false claims under § 3729(a)(1)(A) and 3729(a)(1)(B) . . . fails to state plausible claims." *Foreman*, 19 F.4th at 119-20 (adopting the approach "that a reverse false claim cannot turn on the same conduct underlying a traditional false claim"); *see also United States ex rel. SW Challenger, LLC v. EviCore Healthcare MSI, LLC*, No. 19-CV-2501 (VM), 2021 WL 3620427, at *11 (S.D.N.Y. Aug. 13, 2021) (reasoning that "absent allegations of an independent obligation to pay the government, a reverse false claim is not sufficiently pleaded based only on allegations that a defendant retained Government funds to which they were not entitled"). That is because "[c]oncluding otherwise would mean that any time a defendant violated sub-sections (a)(1)(A) or (B) and received payment, the defendant would also necessarily violate sub-section (G) if it failed to repay to the Government the fraudulently-obtained payments." *Foreman*, 19 F.4th at 120.

Relator's attempt to base its reverse false claim theory on the same underlying conduct establishing its other FCA claims is futile. Namely, Relator advances its reverse false claim theory by alleging that Defendants "knew that some account representatives had forged doctor's signatures, some had inserted ICD9/10 codes on their own and knew that these requisition slips falsely purporting to represent a physician's authorization were the condition precedent to claims being submitted to Medicare and Medicaid." (FAC ¶ 191.) These allegations mirror the traditional false claims allegations Relator brings "under § 3729(a)(1)(A) and 3729(a)(1)(B)," which "fail to state plausible claims." *See Foreman*, 19 F.4th at 119-20. Similarly, the FAC's allegations that "Defendants have nonetheless refused to conduct audits," which "would reveal the precise amount of overpayment refunds due Medicare because of the previously enumerated false billing schemes," (FAC ¶ 193), simply "alleg[es] that [the] defendant[s] retained Government funds to which they were not entitled," *see EviCore Healthcare MSI,* 2021 WL 3620427, at *11. But in the "absen[ce] [of] allegations of an independent obligation to pay the government, a reverse false claim is not sufficiently pleaded[.]" *See id.* Thus, Relator fails to allege a reverse false claim in Count III of its complaint.

All in all, because Relator's FAC does not adequately allege any false claims under the FCA, NYFCA, or NJFCA, this court dismisses Relator's claims in Counts I-V.[20]

---

[20] Because the court finds that Relator fails to state a claim, it does not reach Defendants' statute of limitations arguments. *See Hinds Cnty. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 116 n.8 (S.D.N.Y. 2011) (taking the same approach); *see also Rodriguez v. Efthimiou,* No. 94-CV-3844 (SS), 1995 WL 110059, at *2 n.3 (S.D.N.Y. Mar. 13, 1995) (same) (Sotomayor, Judge).

### E. FCA's *Qui Tam* Provisions & Appointments and Take Care Clauses of Article II of the U.S. Constitution

Because this court dismisses all of the claims in this action on independent nonconstitutional bases, it does not reach the constitutional challenge raised by Defendant Basch. "When . . . a case may be resolved on other grounds, courts may decline to reach a constitutional question to 'avoid deciding constitutional issues needlessly.'" *Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 138 (2d Cir. 2013) (quoting *Christopher v. Harbury*, 536 U.S. 403, 417 (2002)); *see also United States v. Leon*, 766 F.2d 77, 78 (2d Cir. 1985) (explaining that the Second Circuit "follow[s] the rule that a court should not reach constitutional issues when there are other, nonconstitutional grounds upon which it can resolve the case" because "a court should decide no more than is necessary").

In its motion to dismiss Relator's TAC, Defendant Basch argues that "False Claims Act *qui tam* suits *do* fundamentally violate Article II of the Constitution, which vests the executive power—including the power to litigate in the government's name—in the President alone." (Basch Mot. at 42 (emphasis in original); *see also* Basch Mem. (Dkt. 131).) Relator ignores this argument in its opposition. (*See generally* Opp.; Basch & BIM Joint Reply at 30.) However, in response to the United States' brief arguing that "the *qui tam* provisions of the FCA do not violate the Appointments Clause or the Take Care Clause[,]" (United States' Statement of Interest (Dkt. 126) at 11), Relator contends that it "is not empowered to replace the Government or to wield governmental powers," (Relator's Mem. (Dkt. 132) at 5.)

The court follows the Second Circuit's guidance and does not inquire into "constitutional issues when there are . . . nonconstitutional grounds upon which it can resolve the case." As the court explains above, it dismisses all of the claims in the

FAC on nonconstitutional grounds. Therefore, this court "decline[s] to reach [the] constitutional question" here "to avoid deciding constitutional issues needlessly." *See Kreisberg*, 732 F.3d at 138.

## IV. LEAVE TO AMEND

Finally, the court denies Relator's request for leave to amend its Fourth Amended Complaint. Rule 15(a)(2) dictates that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Therefore, "[t]he decision to grant or deny leave to amend rests within the discretion of the trial court." *N. Assurance Co. of Am. v. Square D Co.*, 201 F.3d 84, 87 (2d Cir. 2000). As relevant here, "[a] plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

In this action, Relator has amended its complaint four times. Now, in its discussion of the AKS's willfulness element, Relator argues that it should be granted leave to amend the complaint for the *fifth time* so it can plead "two [New York] state laws" prohibiting kickbacks that unlike the AKS, do not "have any requirements regarding willfulness[.]" (*See* Opp. at 42-43.) Critically, even if Relator were to replace its underlying kickback theories based on the AKS with those premised on New York state laws, the complaint would still fall short of identifying a false claim, which "is the *sine qua non* of a[n] FCA violation." *See Duhaine*, 2022 WL 3226631, at *6. Therefore, Relator "fails to specify . . . how amendment would cure the pleading deficiencies in its complaint." *See Giftports, Inc.*, 758 F.3d at 505. As such, the court denies Relator's request for leave to amend the complaint and DISMISSES all of the claims in the FAC as to all Defendants with prejudice.

## V.   CONCLUSION

For the reasons set forth above, the court GRANTS Defendants' motions in their entirety and DISMISSES all of the claims within Counts I to VII with prejudice.

SO ORDERED.

Dated:       Brooklyn, New York
             March 27, 2025

                                    s/Nicholas G. Garaufis
                                    _____
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge